# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

WADE PARK LAND HOLDINGS, LLC;
WADE PARK LAND, LLC; and
THE THOMAS FAMILY TRUST, by and
through its Trustees, acting in their official
capacities,

        Plaintiffs,

v.

JONATHAN KALIKOW;
WP DEVELOPMENT PARTNERS LLC;
GAMMA LENDING OMEGA LLC;
GAMMA REAL ESTATE CAPITAL LLC;
GRE WP LLC; and BLAKE GOODMAN,

        Defendants.

CIVIL ACTION FILE

NO. 3:20-cv-176-TCB

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY AND EQUITABLE RELIEF, AND FOR AVOIDANCE OF TRANSFERS[1]

## INTRODUCTION

1.      This case is about a coordinated, concerted—and illegal—effort by

Defendants to defraud Plaintiffs out of real estate and cash worth hundreds of

---

[1] Plaintiffs file this First Amended Complaint in accordance with Federal Rule of Civil Procedure 15(a)(1)(B) and BLR 7015. Plaintiffs' filing of this First Amended Complaint moots Defendant Goodman's Motion to Dismiss. *See S. Pilot Ins. Co. v. CECS, Inc.*, 15 F. Supp. 3d 1284, 1287 n.1 (N.D. Ga.), order clarified, 15 F. Supp. 3d 1329 (N.D. Ga. 2013) ("An amended complaint supersedes the original complaint, and thus renders moot a motion to dismiss the original complaint.").

millions of dollars. The story starts innocently enough, with a relatively traditional real-estate loan—albeit a large one. But from there it devolves quickly, into a deliberate effort by Defendants to "loan to own" some of the most valuable commercial real estate in the United States. Defendants' scheme relied on a familiar set of fraudsters' tools—deliberate deception, manufactured loan defaults, misappropriation of assets, and intentional interference with Plaintiffs' efforts to pay Defendants' loan.

2.      By any measure, Defendants' scheme was a wild success. Not only were they paid in excess of $625 million in cash and property, but they now claim to have clear title to the underlying real estate—which alone is worth more than $550 million. And how much did Defendants originally loan to get all of that? About $83 million—less than *15%* of what they ultimately obtained. Plaintiffs bring this case to remedy Defendants' wrongful conduct.

3.      As alleged in detail in this Complaint, this case arises from the financing and development of two valuable parcels of land outside Dallas, Texas, known as Wade Park. Stanley Thomas, one of the most experienced and respected developers of retail and mixed-use properties in the United States, identified the properties, led their acquisition, and ultimately envisioned a multi-billion-dollar development that would include restaurants, retail, entertainment, lodging,

housing, and offices.

4.        Thomas, along with various Thomas-affiliated entities, pumped enormous amounts of money into the acquisition and development of Wade Park. But to realize his vision, Thomas needed more financing. That eventually led to two Thomas-affiliated entities, Plaintiffs Wade Park Land, LLC and Wade Park Land Holdings, LLC (the Debtors in these bankruptcy cases), borrowing about $83 million from Defendant Gamma Real Estate Capital LLC as a temporary bridge loan while Thomas continued his work to close a permanent financing deal with other investors.

5.        But from the very beginning, the Gamma Defendants had other plans. They did not intend to be passive lenders. Rather, they intended to take the Wade Park property from Plaintiffs by manufacturing a default on the bridge loan and then executing a stranglehold on Plaintiffs' ability to raise capital to pay their way out of default. Among other things, Defendants fraudulently misrepresented their intent to comply with their contractual obligations, breached their contractual and fiduciary duties, misappropriated Plaintiffs' assets, intentionally interfered with Plaintiffs' business relationships, and committed a wide variety of crimes—all with the goal and intent of defrauding Plaintiffs and taking the Wade Park property for

themselves.

6.      Plaintiffs now seek to hold Defendants accountable for their actions.

## PARTIES, JURISDICTION, AND VENUE

### *Plaintiffs*

7.      Plaintiff Wade Park Land, LLC ("Wade Park Land") is a Debtor in these bankruptcy cases.  Wade Park Land is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 45 Ansley Drive, Newnan, Georgia 30263.  Wade Park Land was formed to hold title to the southern parcel of land that is part of the Wade Park development project outside of Dallas, Texas (the "Wade Park project").

8.      Plaintiff Wade Park Land Holdings, LLC ("Wade Park Land Holdings") is also a Debtor in these bankruptcy cases.  Wade Park Land Holdings is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 45 Ansley Drive, Newnan, Georgia 30263. Wade Park Land Holdings was formed to hold title to the northern parcel of land that is part of the Wade Park project.

9.      Plaintiffs Carole Thomas and Stacy Thomas bring this action in their capacities as co-trustees of the Thomas Family Trust (hereinafter the "Thomas Family Trust" or "the Trust"), acting in their official capacities and not in their

individual capacities.  The Thomas Family Trust is an irrevocable trust created under the laws of the State of Georgia, and it is the class A member of non-party Wade Park Ventures, LLC, holding a 25% membership interest in that entity.

## *Defendants*

10.     Defendant Jonathan Kalikow ("Kalikow") is an individual and a resident of the State of New York.  For the time periods relevant to this case, Kalikow was an officer of Defendant Gamma Real Estate Capital LLC, Defendant GRE WP LLC, Defendant Gamma Lending Omega, LLC, and Defendant WP Development Partners LLC.  Kalikow directed the actions of those entities.

11.     Defendant Gamma Real Estate Capital LLC ("Gamma Real Estate Capital") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located in the State of New York. Gamma Real Estate Capital may be served through its registered agent, National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

12.     Defendant Gamma Lending Omega LLC ("Gamma Lending Omega") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located in the State of New York.  Gamma Lending Omega may be served through its registered agent, National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

13.     Defendant GRE WP LLC ("GRE WP") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located in the State of New York.  GRE WP is the class B member of non-party Wade Park Ventures, LLC.  GRE WP may be served through its registered agent, National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

14.     Defendant WP Development Partners LLC ("WP Development Partners") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located in the State of New York. WP Development Partners may be served through its registered agent, National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904.[2]

15.     Defendant Blake Goodman ("Goodman") is an individual and a resident of the State of Georgia.  For the time period relevant to this case, Goodman was the Executive Director of Real Estate Investments at non-party Chick-fil-A, Inc.

*Jurisdiction*

16.     This Court has jurisdiction over this action pursuant to, among other

---

[2]     In this complaint, Gamma Real Estate Capital, Gamma Lending Omega, GRE WP, and WP Development Partners are referred to collectively as the "Gamma Defendants."

statutory provisions, 18 U.S.C. § 1964(c); 28 U.S.C. §§ 157, 1331, 1332, 1334, and 1367; and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

17.     This Complaint asserts both non-core proceedings and core proceedings.

18.     The statutory predicates for relief requested in this proceeding include, but are not limited to, 11 U.S.C. §§ 105, 544, 548, 550, and 551; 18 U.S.C. §§ 1343, 1832, 1956, 1961, 1962, 1964, and 1965; 28 U.S.C. § 2201; O.C.G.A. § 7-4-18; O.C.G.A. § 10-5-50; O.C.G.A. § 13-6-11; O.C.G.A. § 16-8-3; O.C.G.A. §§ 16-14-3 and 16-14-4; O.C.G.A. § 51-12-5.1; the Georgia Uniform Voidable Transactions Act, O.C.G.A. § 18-2-70, *et seq*.; Tex. Fin. Code Ann. § 303.002; N.Y. Pen. Law § 190.40; Federal Rule of Civil Procedure 57; and Federal Rules of Bankruptcy Procedure 7001 and 7003.

### *Venue & Personal Jurisdiction*

19.     This Complaint relates to the Chapter 11 bankruptcy cases of Wade Park Land and Wade Park Land Holdings (collectively, the "Debtors"), which were filed on August 26, 2020 (the "Petition Date"), in the U.S. Bankruptcy Court for the Northern District of Georgia.

20.     The Debtors operate their businesses and manage their assets as Debtors-in-Possession pursuant to 11 U.S.C. §§ 1107 and 1108.

21.     Venue is proper in this Court pursuant to, among other statutory provisions, 28 U.S.C. § 1409(a), 18 U.S.C. § 1965, and 28 U.S.C. § 1391(b).  A substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.  In addition, at least one defendant to this case resides in this district, all defendants transacted their affairs in this district, and the ends of justice require that any defendants residing in other districts be brought before this Court.

22.     Defendant Goodman is subject to the personal jurisdiction of this Court because, among other reasons (including those provided under the Bankruptcy Code), he is a Georgia resident.

23.     Defendants Kalikow and the Gamma Defendants are subject to the personal jurisdiction of this Court because, among other reasons (including those provided under the Bankruptcy Code) and as alleged in this Complaint, they have transacted business and committed a series of tortious acts or omissions in Georgia. In addition to the various acts and omissions alleged in this Complaint, Kalikow and the Gamma Defendants have, among other things, sent frequent mail, telephone, and email communications to one or more Georgia residents; and negotiated, executed, and breached contracts with Georgia residents.  Kalikow and the Gamma Defendants purposely availed themselves of the privilege of

conducting activities in Georgia through their contacts with the state of Georgia. Additionally, this action arises out of, or is related to, Defendant Kalikow's and the Gamma Defendants' contacts with Georgia, including Kalikow and the Gamma Defendants conspiring with Goodman (a Georgia resident) to harm Georgia-based Plaintiffs.

24.     Personal jurisdiction over all Defendants is reasonable and fair.

## RELEVANT NON-PARTIES

### *Individuals*

25.     Stanley Thomas ("Thomas") is a commercial real-estate developer based in Newnan, Georgia, who specializes in the development of high-end retail and mixed-use commercial and residential centers.

25.1    During his nearly 40-year career, Thomas has led the development of retail and mixed-use centers all over the country, including Ashley Park (in Newnan, Georgia), The Forum on Peachtree Parkway (in Peachtree Corners, Georgia), The Rim (in San Antonio, Texas), Hamburg Pavilion (in Lexington, Kentucky), Turkey Creek (in Knoxville, Tennessee), and The Forum at Carlsbad (in Carlsbad, California).

25.2    For his projects, Thomas (acting through corporate entities with which he is affiliated) leads all development efforts—he identifies raw land with

development potential; secures (or provides) funding for the project; and oversees the design and development of the project itself.

25.3    Thomas has gained a reputation for identifying undeveloped areas with tremendous—and previously unrecognized—value.  This particular skill of Thomas's, which he developed through his decades of real-estate experience, has made Thomas's development projects uniquely attractive to debt and equity investors.

25.4    Thomas and the corporate entities with which he is affiliated have developed over 100 million square feet of property across the United States.

25.5    For the periods relevant to this case, Thomas was the manager of Plaintiff Wade Park Land, non-parties Wade Park Ventures, LLC and Lebanon 390WR, LLC, and various other entities involved in the Wade Park project.[3]

---

[3]    When engaged in development work, Thomas's practice is to act through corporate entities with which he is affiliated, not in his individual capacity.  As such, and unless otherwise indicated by an express reference to Thomas's individual capacity, references in this Complaint to actions by "Thomas" refer to actions in Thomas's capacity as a corporate officer for an entity with which he is affiliated, not to actions by Thomas individually.  With respect to the Thomas Family Trust, Thomas is not, and has not been at any time during the periods described in this Complaint, an officer or agent of the Trust or otherwise authorized to act on behalf of the Trust.  References in this Complaint to "Thomas-affiliated entities" are not intended to refer to the Thomas Family Trust.

26.     Dan Cathy ("Cathy") is the chairman and chief executive officer of Chick-fil-A, Inc.  Thomas and Cathy have known each other since childhood and have invested in several projects together, including the Wade Park project.

27.     During the time periods relevant to this case, John Porter ("Porter") was an executive vice president with non-party CBRE Group, Inc. Porter introduced Thomas to the Gamma Defendants and brokered the eventual January 17, 2017 deal between Wade Park Ventures, LLC, Wade Park Land, Wade Park Land Holdings, Gamma Real Estate Capital, and various of the other Gamma Defendants.

### *Entities*

28.     Wade Park Ventures, LLC ("Wade Park Ventures") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located at 45 Ansley Drive, Newnan, Georgia 30263. Wade Park Ventures is the sole member of Plaintiffs Wade Park Land and Wade Park Land Holdings.

29.     Lebanon 390WR, LLC ("Lebanon 390WR") is a limited liability company formed under the laws of the State of Georgia.  Lebanon 390WR is the entity that originally purchased the northern parcels that comprise the Wade Park project, and it is the predecessor in title to Wade Park Land Holdings.

11

30.     Bridge Capital, LLC ("Bridge Capital) is a limited liability company formed under the laws of the State of Georgia that lends money for commercial real-estate projects.  Bridge Capital financed Lebanon 390WR's acquisition of the northern Wade Park property.

31.     BAMCAP Partners, LP ("BAMCAP") is a limited partnership formed under the laws of the State of Texas that lends money for commercial real-estate projects.  BAMCAP made two loans, totaling approximately $48 million, to finance acquisition of the southern Wade Park property.  These loans are referred to in this Complaint as the "BAMCAP Loans."

## FACTS

### *The Wade Park Project*

32.     The Wade Park project is located in a one-mile stretch of land in Frisco, Texas, known as the "$5 Billion Mile."  This is the preliminary site plan for Wade Park:



**WADE PARK**

PRELIMINARY SITE PLAN

SCALE = 1:150

TLD
Thomas Land & Development

PSP.028 • 170 ACRES
11 APRIL 2017
ISSUED FOR REVIEW

NORTH

WAKEFIELD
BEASLEY &
ASSOCIATES

33. The $5 Billion Mile got its name because, in addition to Wade Park, the stretch of land is home to The Star (the Dallas Cowboys' headquarters and

training center), Toyota Stadium, and various high-end, mixed-use developments such as Frisco Station and The Gate. The combined capital investment for the area exceeds $5 billion—hence the name.

34.     Until about 2012, the land underlying Wade Park was raw farmland owned by the Wade family. Thomas, using his unique skill set, identified the opportunity presented by the land, envisioning a large, multi-use development with retail shopping, offices, hotel lodging, entertainment, and residential housing.

35.     Under Thomas's vision, the completed Wade Park project would comprise over five-million square feet of office space in two office towers, over one-million square feet of high-end retail space, approximately 2,400 luxury residential housing units, and five hotels.

36.     The Wade Park project and land are very valuable. Appraisals of the land itself show a value in excess of $550 million. And internal analyses of the Wade Park project forecast its developed value to exceed $2 billion.

### *2012 – 2015: Acquisition of the Wade Park Land & Initial Development Work*

37.     Between 2012 and 2015, various Thomas-affiliated entities acquired the approximately 176 acres of land that would become Wade Park. These acquisitions were financed in various ways, including through Thomas's funds (or

funds held by the Thomas Family Trust or by Thomas-affiliated entities) and with purchase mortgages from nonparties Bridge Capital and BAMCAP.

38.     Eventually, the Wade Park land was separated into the north and south properties.  Lebanon 390WR took title to the land that comprises the north property, and Plaintiff Wade Park Land held the south property.

39.     By the end of 2013, Thomas had spent approximately $6 million on pre-development work for the Wade Park project.

40.     Among other things, Thomas oversaw development of architectural and other plans for the site.  Those plans called for development to proceed in phases over a period of years, as shown below:



Certain Phases of the Property

**LEGEND**
- PHASE 1A OPENING - FALL 2019
- PHASE 1B OPENING - FALL 2020
- PHASE 2A OPENING - FALL 2020
- PHASE 2B OPENING - SPRING 2021
- PHASE 3 THRU 6 - TBD

**LEGEND**
- PHASE 1A RETAIL - ~168,635 sf
- PHASE 1B RETAIL - ~426,925
- PHASE 2A RETAIL - ~89,477 sf
- PHASE 2B RETAIL - ~178,799 sf
- PHASE 3 RETAIL - ~174,129 sf

Wade Park
FRISCO · TEXAS

41.     Thomas also began efforts to lease commercial space on the north property.  In December of 2013, Whole Foods became the first tenant to sign a lease.  Over the next three years, the list of tenants expanded to include household names like Restoration Hardware, Ameritrade, Anthropologie, Free People, Steak 48, and Yardhouse, among others.  These leases, as well as others that were signed for Wade Park, were the direct result of Thomas's efforts.

### *2015 – 2016: The Bridge Capital and BAMCAP Loans & Thomas's Efforts to Find a Financing Partner*

42.     Construction on Wade Park continued in the years that followed.  By the spring of 2016, Thomas or Thomas-affiliated entities had invested in excess of $60 million in the project.

43.     At that time, Lebanon 390WR owed approximately $45 million to Bridge Capital for the loan used to acquire and construct the north property.  In addition, Wade Park Land owed approximately $48 million to BAMCAP for the loan used to acquire and construct the south property.

44.     The Bridge Capital and BAMCAP loans were set to mature in early 2017.  Thomas, Lebanon 390WR, and Wade Park Land had good relationships with Bridge Capital and BAMCAP, but Thomas needed to secure additional financing to complete the Wade Park project.  Thomas expected to need more than

$825 million in financing, and that exceeded the capabilities of both Bridge Capital and BAMCAP.

45.     Throughout this period, Thomas worked tirelessly to find a financing partner for the project.  For example, in the fall of 2016, Thomas began serious discussions with both JP Morgan and USAA to provide large-scale loans and equity investments that would finance construction and pay off the existing loans from Bridge Capital and BAMCAP.  Thomas also had serious discussions with other potential lenders or financing partners, including Bluebell International, Columbia Pacific, Bank of the Ozarks, Cargill, Triple 5, and Hines.

46.     Given the size of these potential deals—USAA and JP Morgan, for example, were considering investing hundreds of millions of dollars in the project—the due-diligence processes were extensive, expensive, and time consuming.  Just USAA's and JP Morgan's respective due diligence, for example, continued from the fall of 2016 all the way into 2017.  During that period, Bridge Capital told Thomas that it could not continue to extend the maturity date of its loans to Lebanon 390WR to accommodate the due-diligence schedules.  Thomas, therefore, decided to seek a bridge loan to pay back Bridge Capital and to provide construction financing for the limited period of time while JP Morgan, USAA, and other potential financing partners completed their due diligence.

47.     Thomas identified several potential lenders for a short-term bridge loan, but only one expressed both a willingness to loan sufficient funds and promised to close the deal quickly:  Defendant Gamma Real Estate Capital LLC. But as it turned out, Gamma Real Estate Capital lied about its willingness to fund a loan of that size.

### *October 2016: Thomas & Defendant Gamma Real Estate Capital Agree to a Term Sheet for a $196 Million Bridge Loan*

48.     In the fall of 2016, non-party John Porter introduced Thomas to Defendant Jonathan Kalikow of Gamma Real Estate Capital and the other Gamma Defendants.  Porter was an executive with the well-known and highly respected commercial real-estate firm CBRE, and he ultimately brokered Thomas's deal with Gamma Real Estate Capital.

49.     In or around October of 2016, Thomas flew to New York with Porter to meet Kalikow and Gamma Real Estate Capital.  Before this meeting, Thomas had not done business with Kalikow, Gamma Real Estate Capital, or the other Gamma Defendants, and he wanted to meet Kalikow and the Gamma Defendants' other principles and to learn more about them, their business and experience, and what they could offer.

50.     In agreeing to meet with Kalikow and the Gamma Defendants—and, ultimately, in agreeing to a loan relationship with Gamma Real Estate Capital—

Thomas relied on Porter's assurances that the Gamma Defendants and Kalikow could be trusted for such a significant project. During the October 2016 meeting in New York, Porter told Thomas that Thomas could trust Kalikow and the Gamma Defendants, and that Porter knew this because Porter, Kalikow, and the Gamma Defendants were "partners" on a significant development project in Savannah, Georgia.

51.     When Thomas heard Porter's statement, he understood Porter to be saying that he, Kalikow, and the Gamma Defendants had formed a business partnership with respect to the project in Savannah. Thomas was familiar with the project in Savannah that Porter referenced.

52.     Kalikow was present when Porter said that he, Kalikow, and the Gamma Defendants were "partners." While Kalikow did not state orally that he or the Gamma Defendants agreed with Porter's statement, neither did Kalikow or the Gamma Defendants disavow or contradict the statement. Moreover, Kalikow communicated his (and the Gamma Defendants') agreement through his body language and facial expressions. That is, Thomas understood, based on Kalikow's body language and facial expressions, that Kalikow and the Gamma Defendants agreed with Porter's statement and had a business partnership with Porter.

53.     In deciding to move forward with a bridge loan from Gamma Real Estate Capital, Thomas relied on Kalikow's expression of his and the Gamma Defendants' agreement with Porter's statement that they were "partners" on the Savannah project.

54.     Given, among other things, Thomas's past work with CBRE (Porter's firm), Thomas's familiarity with the Savannah project, Thomas's understanding of the concept of a business partnership, and Kalikow's nonverbal expression of his and the Gamma Defendants' agreement with Porter's statement, Thomas acted reasonably in relying on Kalikow's and the Gamma Defendants' expression.

55.     After the October 2016 meeting, Thomas decided to move forward with a bridge loan from Gamma Real Estate Capital.

56.     In reality, and as Thomas later learned (long after this meeting in October 2016), Porter, Kalikow, and the Gamma Defendants were not "partners" at all with respect to the Savannah project. Rather, Porter had merely tried to get financing for the project from Gamma Real Estate Capital, but he had been unsuccessful. In other words, Porter's statement and Kalikow's and the Gamma Defendants' nonverbal affirmations of that statement were knowingly false.

57.     In reliance on Porter's misrepresentation and Kalikow and the Gamma Defendants' affirmation of that misrepresentation, on or around October 20, 2016,

Thomas and Gamma Real Estate Capital executed a term sheet stating that Gamma Real Estate Capital would lend a Thomas-affiliated entity a total of just over $196,000,000 for Wade Park (the "Gamma Bridge Loan"). Given the urgency of paying off the loan from Bridge Capital, the term sheet envisioned a quick closing of the Gamma Bridge Loan—sometime between November 3 and November 23, 2016.

58. Consistent with Thomas's intent for the Gamma Bridge Loan to be a short-term loan designed to give Thomas more time to close on a permanent financing arrangement with USAA, JP Morgan, or some other financing partner, the term sheet envisioned an initial six-month loan term, along with four six-month extension rights that Thomas could trigger as long as the loan remained current and out of default. Thomas specifically negotiated for these rights to extensions because he knew that closing on a permanent financing arrangement with USAA, JP Morgan, or another financing partner could take longer than the initial six-month term of the loan.

59. A loan of approximately $196,000,000 would allow Thomas not only to pay Bridge Capital, but it would also provide funding for a significant amount of construction to move forward on the south and north Wade Park properties while Thomas continued his work to bring on a permanent financing partner.

60.     Kalikow and the Gamma Defendants knew that Thomas would be attracted to a loan that was large enough to pay off the Bridge Capital loan and finance ongoing construction on the Wade Park project and that could be closed quickly.

61.     Once Thomas and Gamma Real Estate Capital signed the term sheet, Bridge Capital agreed to extend the term of its loan to a date that would allow Thomas to close on the Gamma Bridge Loan and to use the proceeds to pay Bridge Capital.  In connection with that extension, Thomas (or a Thomas-affiliated entity) paid Bridge Capital a fee of approximately $1.25 million.  Kalikow and the Gamma Defendants knew that this fee would have to be paid.

### *November 2016: Gamma Real Estate Capital Changes the Proposed Loan Terms for the First—But Not the Last—Time*

62.     Following execution of the term sheet, Gamma Real Estate Capital began its diligence work, including drafting the loan documents and visiting the Wade Park project.

63.     Until sometime in late November 2016, Thomas understood that everything with the $196 million loan was moving forward well.  But then, on or around November 29, 2016, Kalikow and Gamma Real Estate Capital abruptly changed the loan terms.  Most significantly, they reduced the loan amount from $196 million down to $139 million.

64. In addition, Gamma Real Estate Capital's new loan terms required the involvement of BAMCAP (the lender for the loans encumbering the south Wade Park property). Specifically, Kalikow demanded that Gamma Real Estate Capital be given a second lien on the south Wade Park property behind BAMCAP, and that Gamma Real Estate Capital and BAMCAP enter an intercreditor agreement that would cross-collateralize and cross-default the BAMCAP loans on the south property with the Gamma Bridge Loan.

65. These changes concerned Thomas, but they did not prevent him from moving forward with the Gamma Bridge Loan. Even a loan amount of $139 million would be sufficient to pay off Bridge Capital and to fund construction on the project while Thomas finalized his permanent financing arrangement. And Kalikow and the Gamma Defendants had told Thomas that if the project needed more financing later on, the Gamma Defendants would be willing and able to provide it.

66. In addition, by the time Kalikow and Gamma Real Estate Capital changed the loan terms so dramatically, over a month had passed since execution of the term sheet, and the extended Bridge Capital loan was about to mature again. Thomas wanted to avoid having to obtain—and pay another very large fee for—a further extension of that loan. And given the indications from Kalikow and

Gamma Real Estate Capital that their diligence on the original loan terms was going well, Thomas had stopped his discussions with other potential bridge lenders.

67.     All the while, development of the Wade Park project continued—not just construction, but also efforts to sign leases—and that required an enormous financial investment from Thomas or Thomas-affiliated entities.

68.     Kalikow and Gamma Real Estate Capital were aware of the impending maturity of the extended Bridge Capital loan, of Thomas's desire not to pay another substantial fee to extend the term of that loan again, of Thomas's ongoing development work (and financial investment) in the Wade Park project, and of the pressure those circumstances placed on Thomas and the Thomas-affiliated entities.

69.     In light of these circumstances, Thomas accepted Kalikow's and Gamma Real Estate Capital's changed deal terms from November 2016.

### *December 2016: Gamma Real Estate Capital* ###
### *Changes the Loan Terms Yet Again* ###

70.     On or around December 2, 2016—just days after Thomas agreed to the new terms Kalikow and Gamma Real Estate Capital had demanded, and just a few days before maturity of the Bridge Capital loan—Kalikow and Gamma Real Estate Capital changed the deal terms yet again.  This time they made two

25

significant changes: (1) a further reduction in the loan amount, from $139 million down to approximately $83 million; and (2) a proposal that Kalikow called "The Hammer."

71.     Kalikow's and Gamma Real Estate Capital's decision to reduce the loan amount again materially undermined Thomas's original reason for deciding to take a bridge loan from Gamma Real Estate Capital and not from some other lender. Thomas originally chose Gamma Real Estate Capital as the bridge lender because it expressed a willingness to loan an amount sufficient to pay Bridge Capital *and* to fund ongoing construction during the bridge period. But now, because of Gamma Real Estate Capital and Kalikow's reduction of the loan amount to $83 million, Thomas would not be left with a material amount of funds for construction.

72.     As for the second change—"the Hammer"—Kalikow and Gamma Real Estate Capital demanded that the Gamma Defendants acquire a 75% membership interest in a newly formed entity (what became non-party Wade Park Ventures, LLC). Wade Park Ventures, in turn, would become the sole member of two special-purpose entities that would own the south and north Wade Park properties (what became Plaintiffs Wade Park Land and Wade Park Land Holdings). The Gamma Defendants would retain their 75% membership interest in

Wade Park Ventures unless the Gamma Bridge Loan was repaid within 60 days of its maturity date.

73.     Kalikow and Gamma Real Estate Capital, in other words, demanded that the Gamma Defendants be given an effective 75% ownership interest in the Wade Park project.

74.     According to Kalikow, Gamma Real Estate Capital demanded the Hammer because the Gamma Defendants wanted an interest in Wade Park that was large enough and "painful enough" to deter Thomas from filing bankruptcy.

75.     When Thomas and his team members raised serious concerns about these changes, Kalikow assured them, in a number of phone conversations on or around December 2, 2016, that he and Gamma Real Estate Capital (and the Gamma Defendants generally) did not want to own the Wade Park project.

76.     Kalikow's statement that the Gamma Defendants did not want to own Wade Park was knowingly false.

77.     In reality, Kalikow's and the Gamma Defendants' goal from the very beginning was to take Wade Park.  They knew, after all, that Thomas has a highly developed and unique skill for identifying real-estate development opportunities with enormous potential for profit.

78.     Kalikow's and Gamma Real Estate Capital's demand for these new terms coincided with the extended maturity date of the Bridge Capital loan. Therefore, to avoid the Bridge Capital loan going into default, Thomas had to obtain two more extensions from Bridge Capital, this time to a new maturity date of on or around January 19, 2017.  Thomas (or a Thomas-affiliated entity) paid approximately $2 million in fees for these extensions.  By this time, Thomas (or a Thomas-affiliated entity) had paid Bridge Capital over $6.6 million in extension fees.

79.     After this last extension, Bridge Capital made clear that it would not agree to any more extensions of its loan.

80.     While Thomas was responding to Kalikow's and Gamma Real Estate Capital's demand for new terms, he was also continuing to work with USAA and JP Morgan (and other potential financing partners) to obtain larger loans and potential equity investments that could be used to provide permanent financing for Wade Park and to pay off the Gamma Bridge Loan.  Those discussions, as well as USAA's, JP Morgan's, and the other potential financing partners' respective due-diligence efforts, continued throughout this time period.

81.     Kalikow and the Gamma Defendants were aware of Thomas's ongoing work with USAA, JP Morgan, and the other potential financing partners.

*January 17, 2017: Execution of the Gamma Bridge Loan Documents*

82.     On or around January 17, 2017, the parties executed the loan

documents for the Gamma Bridge Loan.  The final loan consisted of the following

terms:

- Borrowers: Plaintiffs Wade Park Land and Wade Park Land Holdings;

- Collateral: first mortgage lien on the north Wade Park property; second mortgage lien on the south Wade Park property; and second priority liens on other property held by Thomas-affiliated entities;

- Principal amount: $82,750,000;

- Interest rate: 13% (non-default); 21% (default);

- Term:  initial four-month term, with three three-month extensions that could be triggered by the borrowers, provided that the loan was not in default;

- Gamma Real Estate Capital retained the right to approve any modifications to the separate BAMCAP Loan that encumbered the south Wade Park property, but Gamma Real Estate Capital could not unreasonably withhold its consent if the modification did not materially increase the amount of the borrower's obligation to BAMCAP; and

- Implementation of the "Hammer" through the creation of Wade Park Ventures, with Plaintiff Thomas Family Trust acquiring a 25% class A membership interest in Wade Park Ventures, and Defendant GRE WP acquiring a 75% class B membership interest.

83.     In sum, through their pattern of demanding material changes to the

loan terms at the eleventh hour, Kalikow and the Gamma Defendants had

accomplished the following:

- significantly lowered the loan amount from approximately $196 million down to $82,750,000—in the process seriously undermining the very reason Thomas decided to pursue a bridge loan with Gamma Real Estate Capital in the first place;

- obtained a second position lien on certain of Thomas's other properties;

- caused the Gamma Bridge Loan to be cross-collateralized and cross-defaulted with the BAMCAP Loan; and

- obtained an effective 75% interest in the Wade Park project, through the "Hammer."

84.     On or around January 17, 2017, Gamma Real Estate Capital assigned its interests in the Gamma Bridge Loan to Defendant Gamma Lending Omega.

85.     On or around January 17, 2017, Lebanon 390WR assigned its interest in the north Wade Park property to Plaintiff Wade Park Land Holdings.

### *Wade Park Ventures and the Wade Park Ventures Operating Agreement*

86.     Non-party Wade Park Ventures was created on or around January 17, 2017, to be the sole member of Plaintiffs Wade Park Land and Wade Park Land Holdings.  For all periods relevant to this case, Stanley Thomas has been the manager of Wade Park Ventures.

87.     Defendant GRE WP is the Gamma-related entity that acquired a 75%

membership interest in Wade Park Ventures.

88.     This chart illustrates the corporate structure surrounding the Wade

Park project:



89.     The Wade Park Ventures operating agreement contains a number of

important provisions.  For example, the operating agreement provides that Wade

Park Ventures and its wholly owned subsidiaries, Wade Park Land and Wade Park

Land Holdings, do not have the power, authority, or capacity to enter transactions

with any affiliate or related party of a member of Wade Park Ventures.

90.     Defendant GRE WP is a member of Wade Park Ventures.  Gamma

Lending Omega is an affiliate and related party of GRE WP.

91. The Gamma Defendants drafted the Wade Park Ventures operating agreement and were aware of its terms, including this express statement that Wade Park Ventures, Wade Park Land, and Wade Park Land Holdings do not have the power, authority, or capacity to enter transactions with parties who are affiliates of or related to members of Wade Park Ventures.

### The Gamma-BAMCAP Intercreditor Agreement

92. Also on or around January 17, 2017, as part of the closing of the Gamma Bridge Loan, Gamma Real Estate Capital entered an intercreditor agreement with BAMCAP.

93. Significantly, the Gamma-BAMCAP intercreditor agreement gave Gamma Real Estate Capital an option to purchase the BAMCAP Loan if Wade Park Land (the borrower on the BAMCAP Loan) were to default on the BAMCAP Loan.

94. Neither Wade Park Land nor any other Thomas-affiliated entity is a party to the Gamma-BAMCAP intercreditor agreement.

### Kalikow's and the Gamma Defendants' Intent

95. At the time they executed the agreements underlying the Gamma Bridge Loan, Kalikow, Gamma Real Estate Capital, Gamma Lending Omega, and

the other Gamma Defendants intended to manufacture a default by Thomas, Wade Park Land, and Wade Park Land Holdings.

96.     For example, at the time Kalikow and the Gamma Defendants executed the agreements underlying the Gamma Bridge Loan, they did not intend to comply with the contractual obligation not to unreasonably withhold consent to a modification of the BAMCAP Loan.

97.     The Gamma Defendants viewed the fact that Thomas, Wade Park Land, and Wade Park Land Holdings had to get consent to modifications of the BAMCAP Loan as a tool for manufacturing a default of the Gamma Bridge Loan. If, hypothetically, the BAMCAP Loan were about to go into default, but Wade Park Land and Wade Park Land Holdings were able to negotiate a modification of the BAMCAP Loan that avoided the default, the Gamma Defendants could just withhold consent to the modification. That would prevent Wade Park Land and Wade Park Land Holdings from curing the default with BAMCAP—thereby giving the Gamma Defendants grounds to declare a default of the Gamma Bridge Loan. Notably, this could occur *even if Wade Park Land and Wade Park Land Holdings had paid every dollar due on the Gamma Bridge Loan up to that point in time*.

98.     Notwithstanding their intent, Kalikow and the Gamma Defendants represented to Plaintiffs, in the construction loan agreement for the Gamma Bridge Loan, that they would not unreasonably withhold consent to a modification of the BAMCAP loan.

99.     When Plaintiffs executed the various agreements underlying the Gamma Bridge Loan, they did not know (and could not have known) that the Gamma Defendants did not intend to comply with their contractual obligation not to unreasonably withhold consent to a modification of the BAMCAP Loan.

100.    In deciding to execute the agreements underlying the Gamma Bridge Loan, Plaintiffs reasonably relied on the Gamma Defendants' statement that they would not unreasonably withhold consent to a modification of the BAMCAP Loan.

101.    Thomas and Plaintiffs would not have agreed to the agreements underlying and relating to the Gamma Bridge Loan if they had known that the Gamma Defendants did not intend to comply with their obligation not to unreasonably withhold consent to a modification of the BAMCAP Loan.

102.    Among other things, Thomas and Plaintiffs would not have agreed to the forum-selection clauses in the Gamma Bridge Loan agreement, the Wade Park Ventures operating agreement, or the various forbearance agreements and deed-in-lieu agreement, discussed *infra*, if they had known that the Gamma Defendants did

not intend to comply with their obligation not to unreasonably withhold consent to a modification of the BAMCAP Loan.

103.    The forum-selection clauses were not freely and fairly negotiated.

104.    The forum-selection clauses were included in the agreements at issue as a result of the Gamma Defendants' fraud.

105.    The Gamma Defendants fraudulently induced Thomas and Plaintiffs Wade Park Land and Wade Park Land Holdings to agree to these forum-selection clauses by, among other things, knowingly and intentionally misrepresenting their intent to comply with the terms of the Gamma Bridge Loan agreement.

106.    The forum-selection clauses were included in the agreements at issue because of duress, misrepresentation, and other misconduct by the Gamma Defendants, as alleged throughout this complaint.

107.    As it turned out, the Gamma Defendants acted on their intent and successfully manufactured a default of the Gamma Bridge Loan.

### *January 17, 2017, Through Early January 2018*

108.    Following the closing of the Gamma Bridge Loan, construction on the Wade Park project continued.  Thomas or a Thomas-affiliated entity funded the bulk of this construction out of their own money.

109.     The Gamma Bridge Loan was scheduled to mature on May 17, 2017. But on or around May 2, 2017, August 1, 2017, and November 15, 2017, Plaintiffs Wade Park Land and Wade Park Land Holdings exercised their rights to extend the Gamma Bridge Loan's term.  Collectively, those extensions pushed the Gamma Bridge Loan's term out to approximately February 17, 2018.

110.     During this period, Wade Park Land and Wade Park Land Holdings complied with their obligations relating to the Gamma Bridge Loan—including payment of all interest that came due, which totaled approximately $12 million.

111.     Also during this period, Thomas continued his significant efforts to secure a permanent financing partner for the project.  For example, by May of 2017, USAA had signed a letter of intent to invest approximately $195 million to develop the Wade Park project.

112.     Similarly, in October of 2017, a non-party lender[4] signed a letter of intent to loan over $360 million, most of which would be used to pay the Gamma Bridge Loan and continue development of Wade Park.

---

[4]     Plaintiffs have not identified this non-party lender because the letter of intent includes a confidentiality provision.

113.    And in December of 2017, Thomas significantly furthered his negotiations with JP Morgan, moving closer to solidifying a deal that would invest hundreds of millions in the Wade Park project.

114.    Thomas (or Thomas-affiliated entities) paid significant due-diligence fees to these potential lenders and development partners.  For example, Thomas paid JP Morgan alone a $500,000 diligence fee.

115.    Each of these deals would have been sufficient to pay the Gamma Bridge Loan in its entirety and to finance significant development work on the Wade Park project.

116.    But as explained in more detail below, Kalikow and Gamma improperly and tortiously interfered with Thomas's efforts to obtain permanent financing.  Their actions caused these potential development partners—who otherwise were willing to invest in the Wade Park Project—to walk away.

### *January 2018: The Gamma Defendants Manufacture a Default By Unreasonably Withholding Consent to a Modification of the BAMCAP Loan*

117.    In January 2018, the BAMCAP Loan on the south Wade Park property was set to mature, but Thomas had not completed his negotiations with the various permanent financing partners.  So, before the BAMCAP Loan's maturity date, Thomas and BAMCAP agreed to a one-month extension to give Thomas additional time to finalize those negotiations.

118.    For the one-month extension, Thomas (or a Thomas-affiliated entity) agreed to pay BAMCAP an approximately $530,000 extension fee.  That amount was to be capitalized into the BAMCAP Loan, thereby increasing the loan's $48 million principal amount by about 1%.

119.    Capitalizing the extension fee into the principal of the BAMCAP Loan would not have materially increased Wade Park Land's obligations under the BAMCAP Loan.

120.    Thomas kept the Gamma Defendants informed of the status of his negotiations with BAMCAP over this potential modification.  Kalikow and the Gamma Defendants indicated to Thomas that the Gamma Defendants would consent to the modification of the BAMCAP Loan.

121.    The Gamma Defendants' consent to the modification was necessary under the loan agreement for the Gamma Bridge Loan.

122.    But under that same loan agreement, the Gamma Defendants promised not to unreasonably withhold consent.

123.    Nevertheless, in late January 2018, the Gamma Defendants withheld consent to the proposed modification of the BAMCAP Loan.

124.    The Gamma Defendants acted unreasonably in withholding consent.

125.     The Gamma Defendants knew that it was unreasonable to withhold consent to the proposed modification of the BAMCAP Loan.

126.     The Gamma Defendants breached the loan agreement for the Gamma Bridge Loan by withholding consent to the proposed modification of the BAMCAP Loan.

127.     Thomas and BAMCAP reached their agreement to modify the BAMCAP Loan before the BAMCAP Loan matured.  But by the time Kalikow and the Gamma Defendants communicated their decision to withhold consent, the BAMCAP Loan had already matured.

128.     As a result of the Gamma Defendants' unreasonable withholding of consent, BAMCAP declared a default by Wade Park Land.

129.     Under the terms of the Gamma Bridge Loan, BAMCAP's declaration of default then allowed the Gamma Defendants to declare their own default on the Gamma Bridge Loan—even though Wade Park Land and Wade Park Land Holdings had paid every dollar due up to that date.

130.     On or around January 26, 2018, the Gamma Defendants declared Wade Park Land and Wade Park Land Holdings to be in default on the Gamma Bridge Loan.

131.    Had the Gamma Defendants not unreasonably withheld consent to the modification of the BAMCAP Loan, the Gamma Defendants would not have been able to declare a default of the Gamma Bridge Loan.

132.    At this point in time, Kalikow and the Gamma Defendants had achieved their original goal—to manufacture a default by Wade Park Land and Wade Park Land Holdings and thereby put those entities and Thomas in a position where Kalikow and the Gamma Defendants had unfair and improper leverage over them.

133.    Once the Gamma Defendants declared a default, they had effective control over Thomas's ability to obtain financing to pay off the Gamma Bridge Loan.  Kalikow and the Gamma Defendants could now, among other things:

- dictate whatever terms they wanted in exchange for forbearing from foreclosing on the Wade Park project;

- demand that Thomas inform them of his efforts to obtain financing to pay the Gamma Bridge Loan; and

- demand that they be allowed to meet with prospective financiers identified by Thomas—and then use this access to prevent Thomas from securing financing.

134.    Kalikow and the Gamma Defendants knew that the Gamma Defendants' declaration of default would allow them to control Thomas's ability to

secure financing to pay the Gamma Bridge Loan and get the Gamma Defendants out of Wade Park.

135.     Despite the Gamma Defendants' declaration of default, Thomas continued construction on Wade Park with his own money (or with money of a Thomas-affiliated entity), and Thomas continued to work tirelessly to obtain financing that would allow him to pay the Gamma Bridge Loan.

136.     Following the Gamma Defendants' declaration of default, Wade Park Land and Wade Park Land Holdings entered a series of forbearance agreements with the Gamma Defendants.  To Thomas, Wade Park Land, and Wade Park Land Holdings, the forbearance agreements were necessary to avoid a foreclosure sale of the Wade Park properties.  But the Gamma Defendants would agree to forbear only for limited periods of time—sometimes as short as less than two months—which meant that Thomas, Wade Park Land, and Wade Park Land Holdings were continuously in the position of having to seek additional forbearance agreements from the Gamma Defendants.  That gave the Gamma Defendants unfair and outsized leverage over Thomas, Wade Park Land, and Wade Park Land Holdings.

137.     It was through those subsequent forbearance agreements that Kalikow and the Gamma Defendants attempted to dictate the terms of their relationship with

Thomas, the Thomas-affiliated entities, Wade Park Land, and Wade Park Land Holdings going forward.

138.    In addition, Wade Park Land and Wade Park Land Holdings paid a fee to Gamma in connection with each forbearance agreement.  In total, those fees amounted to more than $38 million in cash and property—on a loan that was originally for $82,750,000.

139.    During this same period, the Gamma Defendants also began advertising foreclosure of the Wade Park properties.  The advertisements severely impacted Thomas's ability to get financing to pay the Gamma Bridge Loan and get the Gamma Defendants out of Wade Park.

140.    But for the Gamma Defendants' misrepresentation that they intended to comply with their obligation under the Gamma Bridge Loan agreement not to unreasonably withhold consent to a modification of the BAMCAP Loan, and but for the Gamma Defendants' breach of the loan agreement by unreasonably withholding consent to a modification of the BAMCAP Loan, Wade Park Land and Wade Park Land Holdings would not have entered any of the forbearance agreements with the Gamma Defendants and would not have paid the fees associated with those agreements.  Each of the forbearance agreements is unenforceable as to Plaintiffs.

141.     Likewise, but for the Gamma Defendants' misrepresentation that they intended to comply with the obligation under the Gamma Bridge Loan agreement not to unreasonably withhold consent to a modification of the BAMCAP Loan, and but for the Gamma Defendants' breach of the loan agreement by unreasonably withholding consent to a modification of the BAMCAP Loan, the Gamma Defendants would not have been able to advertise foreclosure of the Wade Park properties.

### January 2018 to Early 2019: The Gamma Defendants Thwart Thomas's Efforts to Secure Financing that Would Pay Off the Gamma Bridge Loan and Get the Gamma Defendants Out of Wade Park

142.     As alleged above, through the forbearance agreements, Kalikow and the Gamma Defendants required that Thomas keep them informed of his efforts to secure financing to pay the Gamma Bridge Loan.

143.     Armed with this information, Kalikow and the Gamma Defendants interfered in every attempt by Thomas to obtain financing—and thereby prevented Thomas from leveraging assets to pay the Gamma Bridge Loan.

144.     *Synovus.*  For example, Thomas (and the Thomas-affiliated entities) had a long-standing relationship with non-party Synovus Bank.  At one point in time, Thomas and his affiliated entities were Synovus's largest customer.

145.     Kalikow and the Gamma Defendants knew that Synovus held mortgage loans on certain of Thomas's other properties, including a development in Newnan, Georgia called Ashley Park.  Thomas told Kalikow and the Gamma Defendants that he intended to pull equity out of those properties by refinancing with Synovus to pay a substantial portion of the Gamma Bridge Loan.  Thomas also told Kalikow that Synovus had agreed to discount the loans for Thomas.

146.     But then—and much to Thomas's shock—he learned from Synovus that the Gamma Defendants had bought Thomas's loans from Synovus.

147.     The Gamma Defendants purchased the loans from Synovus in an effort to prevent Thomas from refinancing those loans, to prevent Thomas from pulling equity out of the properties that were encumbered by the loans, and to prevent Thomas from using that equity to pay a substantial portion of the Gamma Bridge Loan.

148.     ***Ardent Financial.***  Similarly, Thomas (or Thomas-affiliated entities) owned properties in Orlando, Florida, and Franklin, Tennessee, that were encumbered with loans from non-party Ardent Financial.

149.     These properties—especially the Orlando property—were extraordinarily valuable because of their legal status and a unique bundle of entitlements, development rights, and private declarant rights associated with them.

Much of the Orlando property's value, for example, derived from confidential and proprietary information and plans for the property held by Thomas (or Thomas-affiliated entities) and developed at great expense and over a significant period of time. The Orlando property had more than enough equity in it to pay off the Gamma Bridge Loan.

150.     In or around May of 2018, Thomas was pursuing a refinance with a non-party lender[5] of the Orlando and Tennessee properties that, if successful, would have generated enough cash to pay the Gamma Bridge Loan. But then Kalikow and the Gamma Defendants approached Thomas and offered to lend $148 million on just the Orlando property. That loan amount would have been more than enough to pay the Gamma Bridge Loan. The Gamma Defendants signed a letter of intent with Thomas for a $148 million loan that same month.

151.     Thomas intended to use the proceeds of this loan to, among other things, pay the Gamma Bridge Loan.

152.     As part of the diligence efforts for the $148 million loan, Thomas (or Thomas-affiliated entities) shared extensive confidential and proprietary information with Kalikow and the Gamma Defendants about the Orlando property and the unique aspects of it that contributed to its high value.

---

[5]     This is the same non-party lender discussed *supra* at ¶ 112.

153. The Gamma Defendants agreed that they would keep all of this information confidential, and that they would not use the information for any purpose other than evaluating the proposed $148 million loan. Thomas would not have provided this confidential information to Kalikow and the Gamma Defendants had he not understood Kalikow and the Gamma Defendants to agree to maintain its confidentiality.

154. Then, in the summer of 2018—and without disclosing this to Thomas or his team—the Gamma Defendants purchased the loans from Ardent Financial that encumbered the Orlando and Tennessee properties. They also abruptly withdrew the $148 million loan they had proposed to Thomas for that property.

155. By purchasing Ardent Financial loans, Kalikow and the Gamma Defendants prevented Thomas from pulling equity out of either the Orlando or Tennessee properties to pay the Gamma Bridge Loan. Kalikow and the Gamma Defendants, in other words, used Thomas's confidential information to shut down one of Thomas's main sources of financing for the Wade Park project.[6]

---

[6] As explained, *infra* at ¶¶ 210-251, around this same time, Kalikow and the Gamma Defendants were also secretly working with Defendant Blake Goodman, who, Kalikow and the Gamma Defendants knew, had fiduciary duties of loyalty and to maintain the confidentiality of information to Plaintiffs Wade Park Land and Wade Park Land Holdings, to Thomas, and to other Thomas-affiliated entities that prohibited Goodman from sharing those entities' confidential information and

156.    ***Bluebell International.***  Kalikow and Gamma also interfered with Thomas's efforts to secure financing from non-party Bluebell International.

157.    In or around September of 2018, Thomas and Bluebell International agreed on a term sheet for a $725 million loan for Wade Park.  Thomas intended to use the loan proceeds to, among other things, pay the Gamma Bridge Loan and get the Gamma Defendants out of Wade Park, as well as to fund construction moving forward.

158.    Kalikow and the Gamma Defendants made multiple statements to Thomas, to members of Thomas's team, and to Plaintiffs encouraging pursuit of the Bluebell loan and stating that the Gamma Defendants believed the loan to be a viable refinancing option.

159.    But then, on or around December 27, 2018, Kalikow called Bluebell's principal, Rick Lee.  In stark contrast to Kalikow's repeated statements to Thomas in favor of the Bluebell loan, on the call Kalikow attacked Mr. Lee, insulting him and Bluebell, calling Mr. Lee a "thief" and a "scumbag," and stating that the

_____

using it to his own benefit.  Nevertheless, Goodman met with Kalikow and shared additional confidential and proprietary information about the Wade Park project, the Orlando property, the Tennessee project, and Ashley Park.  In addition to using the confidential information they received from Thomas, the Gamma Defendants also used the different information they received from Goodman to obstruct Thomas's efforts to secure financing to pay the Gamma Bridge Loan.  *See infra* at Count VIII.

Gamma Defendants would not allow a loan from Bluebell to move forward. Kalikow then hung up on Mr. Lee.

160.     Following this call, Thomas's potential loan from Bluebell fell apart.

161.     Kalikow's and Gamma's actions caused Bluebell to walk away from the $725 million deal. On information and belief, but for Kalikow's and the Gamma Defendants' conduct, Bluebell would have proceeded with the loan.

162.     Kalikow's and the Gamma Defendants statements to Thomas, members of Thomas's team, and Plaintiffs encouraging pursuit of the Bluebell loan and indicating that the Gamma Defendants believed the loan to be a viable refinancing option were knowingly false. Thomas and Plaintiffs relied on those statements in deciding to seek a loan from Bluebell.

163.     ***Columbia Pacific.*** Kalikow and the Gamma Defendants also interfered with Thomas's efforts to obtain financing from non-party Columbia Pacific.

164.     In or around January of 2019, Jake Sharp, a broker with whom Thomas worked, arranged a deal with Columbia Pacific that would involve Columbia Pacific both paying off the existing loans on the Wade Park properties and funding construction going forward.

165.	Kalikow and the Gamma Defendants knew about the potential deal with Columbia Pacific because, once again, they required Thomas to keep them fully informed of his efforts to secure financing.

166.	In December and January of 2019, Kalikow and the Gamma Defendants encouraged Thomas to pursue the Columbia Pacific deal.

167.	In addition, and during that same period, Kalikow and the Gamma Defendants worked extensively with Mr. Sharp and discussed the Columbia Pacific deal with him at length. Among other things, Kalikow and the Gamma Defendants told Mr. Sharp that they would agree to the terms proposed by Columbia Pacific and that they thought the deal would work to pay the Gamma Bridge Loan. They encouraged Mr. Sharp to continue his efforts to bring the deal to a close.

168.	Kalikow and the Gamma Defendants were so certain and reassuring in their statements to Mr. Sharp that Mr. Sharp spent more than $50,000 simply to arrange a meeting between Columbia Pacific's executives and Kalikow in January of 2019. Mr. Sharp's brokerage fee on the loan would have been millions of dollars, and so from his perspective, a $50,000 investment in the meeting was worthwhile.

169.	The Columbia Pacific executives attended the meeting in person. Kalikow could not attend in person, so he called in by phone.

170.     As it turned out, Kalikow's and the Gamma Defendants' statements to Thomas and Mr. Sharp about their view of the proposed Columbia Pacific deal were knowingly false.

171.     At the January 2019 meeting—which occurred very close in time to when Kalikow and Gamma made their statements to Thomas and Mr. Sharp in support of the Columbia Pacific deal—Kalikow and the Gamma Defendants tried to scare Columbia Pacific off.  Among other things, Kalikow yelled at the Columbia Pacific executives; he said that the Gamma Defendants would never agree to the terms Columbia Pacific had proposed; and he said that the Gamma Defendants would never agree to let Wade Park Land and Wade Park Land Holdings refinance the Gamma Bridge Loan.

172.     According to Mr. Sharp, Kalikow's statements during the meeting with Columbia Pacific were totally inconsistent with the statements Kalikow had made to Mr. Sharp (again, over the phone) in the days leading up to the call. Following the meeting, Mr. Sharp was left feeling deceived and embarrassed.

173.     Kalikow and the Gamma Defendants' statements to Mr. Sharp and to the Columbia Pacific executives were knowingly false.  Kalikow and the Gamma Defendants made those statements through interstate wire communication facilities.

174.     Kalikow's and the Gamma Defendants' interference worked, as Columbia Pacific walked away from the deal.

175.     But for Kalikow's and the Gamma Defendants' interference, Columbia Pacific would have proceeded with a loan to Wade Park Land and Wade Park Land Holdings and the Gamma Bridge Loan would have been paid off.

### Summer of 2018:  Gamma Buys the BAMCAP Loan on the South Wade Park Property

176.     While Kalikow and the Gamma Defendants were busy attempting to thwart Thomas's efforts to obtain permanent financing for the Wade Park project, on or around July 30, 2018, Defendant Gamma Lending Omega bought the BAMCAP Loan from BAMCAP.  Following this purchase, Gamma Lending Omega owned all loans encumbering the north and south Wade Park properties.

177.     Before Gamma Lending Omega's purchase of the BAMCAP Loan, Wade Park Land and Wade Park Land Holdings had entered three forbearance agreements with Gamma Lending Omega.  Those three agreements applied only to the Gamma Bridge Loan.  But following Gamma Lending Omega's purchase of the BAMCAP Loan, and continuing through February 2019, Wade Park Land and Wade Park Land Holdings entered three more forbearance agreements with Gamma Lending Omega, along with a deed-in-lieu-of-foreclosure agreement—

each of which would apply not just to the original Gamma Bridge Loan, but also to the BAMCAP Loan.

178.     Specifically, Wade Park Land and Wade Park Land Holdings entered forbearance agreements with Gamma Lending Omega for the BAMCAP Loan in August, October, and December 2018.  And Wade Park Land and Wade Park Land Holdings entered a deed-in-lieu-of-foreclosure agreement with Gamma Lending Omega in February 2019.

179.     In addition to being unenforceable as a result of the Gamma Defendants' original fraud (*see supra* at ¶¶ 117-131), Gamma Lending Omega's purchase of the BAMCAP Loan, the forbearance agreements, and the deed-in-lieu agreement are all *ultra vires*—and thus void—under the operating agreements of Plaintiffs Wade Park Ventures, Wade Park Land, and Wade Park Land Holdings. *See infra* at Count I of this Complaint.

180.     Wade Park Land and Wade Park Land Holdings do not have corporate authority or power to enter a transaction with an entity that is related to a member of Wade Park Ventures.  Defendant GRE WP, which is a 75% member of Wade Park Ventures, is related to Gamma Lending Omega, which is a party to the August, October, and December 2018 forbearance agreements, as well as the deed-in-lieu agreement with Wade Park Land and Wade Park Land Holdings.

181.     In early 2019, Thomas began discussions with non-party Hines to

provide permanent financing for the Wade Park project.  Hines, which is one of the

largest real-estate development firms in the world, has a long-standing relationship

with Thomas and the Thomas-affiliated entities.

182.     Once more, Kalikow and the Gamma Defendants required that

Thomas keep them informed about his discussions with Hines, and Thomas did so.

For example, in January and February 2019, Thomas and Kalikow spoke almost

daily about Thomas's financing efforts for Wade Park.

183.     Thomas's discussions with Hines were very productive, and Kalikow

and the Gamma Defendants expressed their support for a deal with Hines.

184.     But Thomas faced a timing issue.  The then-current forbearance

period with the Gamma Defendants (the sixth forbearance agreement) was set to

expire soon, so Thomas requested more time from the Gamma Defendants to

complete his discussions with Hines.

185.     But this time, instead of offering another forbearance agreement,

Kalikow and the Gamma Defendants demanded that Thomas, Wade Park Land,

and Wade Park Land Holdings enter a deed-in-lieu-of-foreclosure agreement,

pursuant to which Wade Park Land and Wade Park Land Holdings would deliver

deeds to the Wade Park properties to Gamma Lending Omega, and Gamma Lending Omega would hold those deeds in escrow until Wade Park Land and Wade Park Land Holdings paid the Gamma Bridge Loan and the BAMCAP loan.

186.     At the same time, Kalikow and the Gamma Defendants also told Thomas that the deed-in-lieu agreement would not actually cause a transfer of the Wade Park deeds to Gamma.  Rather, the Gamma Defendants would give Thomas time to "buy back" the properties by paying off the loans.  According to Kalikow and the Gamma Defendants, Thomas had to "trust" that the Gamma Defendants would honor this buy-back promise.

187.     Understandably, Thomas was very concerned with this proposal.  Not only were the Wade Park properties themselves worth over $550 million, but (as the Gamma Defendants and Kalikow knew) Thomas was aggressively pursuing financing to pay the Gamma Bridge Loan and the BAMCAP Loan and to get the Gamma Defendants out of the Wade Park project.  Turning over deeds (even deeds-in-lieu accompanied by a buy-back right) to the Gamma Defendants would make it very difficult—if not impossible—for Thomas to secure financing that used the properties as collateral.

188.     Thomas thus demanded that Kalikow and the Gamma Defendants execute a written buy-back agreement, which Thomas could then use to show

potential financing partners that Wade Park Land and Wade Park Land Holdings had an enforceable interest in the Wade Park properties.

189. Kalikow and the Gamma Defendants repeatedly assured Thomas that they would execute a written buy-back agreement and that the buy-back period would be at least six months. But they also said they could not execute the written agreement until "a few days after" execution of a deed-in-lieu agreement.

190. Relying on Kalikow's and the Gamma Defendants' statements, Wade Park Land, Wade Park Land Holdings, and the Thomas Family Trust entered a deed-in-lieu-agreement with Gamma Lending Omega on or around February 4, 2019, and the Gamma Defendants received deeds to the Wade Park properties shortly thereafter.

191. Under the deed-in-lieu agreement, the Gamma Defendants would hold the deeds in escrow, provided that Wade Park Land and Wade Park Land Holdings made certain payments. Wade Park Land and Wade Park Land Holdings made at least one such payment—on or around February 5, 2019, a parcel of real estate located in Sarasota, Florida was transferred to the Gamma Defendants. That parcel was worth approximately $4 million.

192. However—and because of Kalikow's and the Gamma Defendants' efforts to strangle Thomas's sources of financing—Wade Park Land and Wade

Park Land Holdings were not able to make a subsequent payment to the Gamma Defendants, as required by the deed-in-lieu agreement. Therefore, on or around February 21, 2019, Defendant Gamma Lending Omega released the deeds from escrow and recorded them in Texas.

193.     But for the Gamma Defendants' intentional misrepresentation that they intended to comply with the obligation under the Wade Park loan agreement not to unreasonably withhold consent to a modification of the BAMCAP Loan, and but for the Gamma Defendants' breach of the loan agreement by unreasonably withholding consent to a modification of the BAMCAP Loan, Wade Park Land and Wade Park Land Holdings would not have entered the deed-in-lieu agreement for the Wade Park project. Neither would they have delivered deeds to the Wade Park properties to the Gamma Defendants. The deed-in-lieu agreement is unenforceable.

194.     Throughout this period, Kalikow, the Gamma Defendants, and Thomas discussed the buy-back agreement. But just like Kalikow's and the Gamma Defendants' actions with respect to the Gamma Bridge loan, they repeatedly changed the proposed buy-back terms, slowly whittling them down to shorter and shorter periods. Eventually—and despite their earlier promises of a six-month buy-back period—Kalikow and the Gamma Defendants stated they

would only agree to a six-week buy-back period. But at the same time, they assured Thomas that he could trust that they would give him whatever time he needed to buy the property back.

195. Thomas, relying on Kalikow's and the Gamma Defendants' assurances that they would allow a buy-back well beyond the six-week buy-back period, ultimately accepted a written agreement with a six-week buy-back period.

196. The Gamma Defendants finally signed the written buy-back agreement on or around March 6, 2019—over a month after execution of the deed-in-lieu agreement, and about two weeks after the Gamma Defendants released the deeds from escrow and recorded them.

197. The short six-week period made it extraordinarily difficult for Thomas to raise the over $150 million that would be necessary to pay the buy-back price on the Wade Park properties. Because Kalikow and the Gamma Defendants had access to all information concerning Thomas's efforts to secure financing to pay the loans held by Gamma—and because Kalikow and the Gamma Defendants had improperly interfered to prevent all of those financings from happening—Kalikow and the Gamma Defendants knew, when they proposed the written buy-back agreement, that Thomas would not be able to meet its terms.

198.     On or around April 15, 2019, the written buy-back agreement expired. Nevertheless, Kalikow and the Gamma Defendants continued to tell Thomas that he would have more time to buy back the Wade Park properties.

199.     But then Kalikow and the Gamma Defendants changed the buy-back terms yet again, this time telling Thomas that whoever bought the Wade Park properties back must be a "strawman"—in other words, someone other than Thomas or a Thomas-affiliated entity.

200.     This was a confounding request to Thomas, as there was no legitimate reason to require that a buy-back be accomplished by someone other than Thomas or a Thomas-affiliated entity.

201.     But given the importance of the Wade Park project to Thomas—and given the extraordinary amount of money and property Thomas and Thomas-affiliated entities had invested in the project up to that point—Thomas proceeded to locate a potential "strawman":  Hines.

202.     In the summer of 2019, Hines and the Gamma Defendants discussed a potential purchase of the Wade Park properties.  But the Gamma Defendants rejected every proposal by Hines—and told Hines that the Gamma Defendants would not sell the properties to Hines if Thomas would be involved in any way.

203.    Hines rejected the Gamma Defendants' demand that Thomas be excluded, and it walked away from the deal.

204.    At this point, Thomas concluded that the Gamma Defendants could not be trusted and that the Gamma Defendants had, from the very beginning, intended to manufacture a default and to take the Wade Park properties for themselves.

205.    Following these events, Thomas, Wade Park Land, and Wade Park Land Holdings learned of Kalikow's and the Gamma Defendants' improper interference with Thomas's efforts to secure financing that would have paid the loans held by the Gamma Defendants.

### The Status of the Wade Park Project

206.    Throughout this entire time period, Thomas and the Thomas-affiliated entities continued to develop the Wade Park project. For example, they constructed shells for Whole Foods and other buildings, graded the entire site, developed various parking areas, installed infrastructure like underground utilities and detention ponds, installed pad sites, built the project's main street, and built a massive four-story underground parking deck.

### The Gamma Defendants' Scheme Was a Resounding Success

207.    By all measures, the Gamma Defendants' scheme was a resounding success.  By the summer of 2019:

- the Gamma Defendants had been paid a total of at least $76.6 million in cash and property by Thomas, a Thomas-affiliated entity, Wade Park Land, or Wade Park Land Holdings—more than 92% of the original Gamma Bridge Loan and BAMCAP loan amounts; *and*

- the Gamma Defendants claimed complete ownership of the Wade Park properties themselves—valued at over $550 million in their current state, and with an extraordinary potential value once developed.

208.    All in, the Gamma Defendants received over $625 million on a loan amount of approximately $83 million.

209.    This Court should not permit the Gamma Defendants to enjoy these ill-gotten gains.

### Allegations Relating to Blake Goodman

210.    During the relevant time period, Defendant Blake Goodman was the Executive Director of Real Estate Investments for non-party Chick-fil-A, Inc.

211.    Goodman also worked extensively with non-party Dan Cathy (Chick-fil-A's chairman and chief executive officer), and with other Chick-fil-A executives, on other real-estate investments.

212.    In or around March of 2018, Thomas and Cathy agreed that Cathy would invest in the Wade Park project by, among other things, providing funds to

be used for construction. Cathy initially offered to invest $80 million in Wade Park.

213.     Cathy also wanted to invest in Thomas's other projects, such as the Orlando property, Ashley Park, and the Tennessee project. As a condition of his investment, Cathy required that Goodman (who functioned as Cathy's deputy) be given management responsibility for all of these projects, as well as for Wade Park.

214.     To that end, in or around March of 2018, Goodman, Cathy, Thomas, Wade Park Land, and Wade Park Land Holdings agreed to form a joint venture. Among other things, the joint venture's purpose was to develop Wade Park, the Orlando property, the Tennessee project, and Ashley Park.

215.     While Thomas, Wade Park Land, Wade Park Land Holdings, Goodman, and Cathy agreed to form their joint venture in or around March of 2018, they did not execute a written joint-venture agreement until later, in or around July of 2018. The written agreement memorialized a portion of the joint-venture agreement that had been reached in March.

216.     Through the joint venture, Cathy ultimately invested $10 million in Wade Park.

217.     Also in July of 2018, and in accordance with their joint-venture agreement, Cathy, Thomas, and other Thomas-affiliated entities amended and restated the operating agreement for non-party Fourth Quarter Properties XLIX, LLC ("Fourth Quarter Properties").  Fourth Quarter Properties was a holding company for certain portions of the Orlando project.  Through the amended and restated operating agreement—and, again, in accordance with their joint-venture agreement from March 2018—Goodman became the manager of Fourth Quarter Properties.

218.     As a participant in the joint venture, and as manager of Fourth Quarter Properties, Goodman owed fiduciary duties to Thomas, Wade Park Land, Wade Park Land Holdings, and other Thomas-affiliated entities.  These included, among other things, a duty of loyalty and a duty to maintain the confidentiality of (and not use to his own benefit) information he learned in connection with the joint venture or Fourth Quarter Properties about the Wade Park, Orlando, Tennessee, or Ashley Park projects.

219.     Goodman, who holds a law degree from the University of Georgia, understood these duties.

220.     Around this same time, Goodman was starting his own real-estate investment firm with other executives from Chick-fil-A and members of the Cathy

family. While Goodman had grand ambitions for his future in real estate, he did not have his own projects. Goodman, therefore, viewed Thomas as an opportunity for him to exploit. Indeed, back in 2017, Goodman had approached Thomas about investing in various of Thomas's projects, but Thomas was not interested in working with Goodman at that time. Goodman thus saw the joint venture as a way to boost his own firm by piggybacking on Thomas's projects, connections, and expertise to catapult himself and his new firm to the top of the real-estate development world.

221. Following formation of the joint venture, and continuing through at least the fall of 2018, Goodman requested and demanded access to extensive confidential and proprietary information about Wade Park, the Orlando property, the Tennessee property, and Ashley Park.

222. Under the auspices of the joint venture, Thomas, Wade Park Land, and Wade Park Land Holdings (and other Thomas-affiliated entities) shared extensive confidential and proprietary information with Goodman about Wade Park, the Orlando property, the Tennessee property, and Ashley Park..

223. For the Wade Park project, the confidential and proprietary information included, among other things, details about plans for developing the properties; plans for leasing the properties and otherwise monetizing the

properties' value; details of the financing arrangements in place for the properties, as well as of prospective financing options; the identity of potential business partners and tenants; and internal financial analyses and projections relating to the properties (collectively, the "Thomas-Wade Park Trade Secrets").

224.     For the Orlando property, the confidential and proprietary information included, among other things, details about plans for developing the properties; plans for leasing the properties and otherwise monetizing the properties' value; details of the financing arrangements in place for the properties, as well as of prospective financing options; the identity of potential business partners and tenants; internal financial analyses and projections relating to the properties; and confidential information developed by Thomas (and not known to anyone outside of Thomas's team) about the unique aspects of the Orlando property that gave it a particularly high value (collectively, the "Thomas-Orlando Trade Secrets").

225.     For the Tennessee project, the confidential and proprietary information included, among other things, details about plans for developing the properties; plans for leasing the properties and otherwise monetizing the properties' value, including extensive knowledge on executed leases; details of the financing arrangements in place for the properties, as well as of prospective financing options; the identity of potential business partners and tenants; and

internal financial analyses and projections relating to the properties (collectively, the "Thomas-Tennessee Trade Secrets").

226.     For the Ashley Park project, the confidential and proprietary information included, among other things, details about plans for developing the properties; plans for leasing the properties and otherwise monetizing the properties' value; details of the financing arrangements in place for the properties, as well as of prospective financing options; the identity of potential business partners and tenants; and internal financial analyses and projections relating to the properties (collectively, the "Thomas-Ashley Park Trade Secrets").

227.     Goodman had a duty to keep the Thomas-Wade Park, Thomas-Orlando, Thomas-Tennessee, and Thomas-Ashley Park Trade Secrets confidential and not to use them to his own benefit or to Thomas's, Wade Park Land's, or Wade Park Land Holdings' detriment.

228.     Thomas, Wade Park Land, and Wade Park Land Holdings (and other Thomas-affiliated entities) had gone to great effort and expense to develop the Thomas-Wade Park, Thomas-Orlando, Thomas-Tennessee, and Thomas-Ashley Park Trade Secrets.  The information that comprised these Trade Secrets derived its value from the fact that it was confidential.

229. Thomas, Wade Park Land, and Wade Park Land Holdings (and other Thomas-affiliated entities) took reasonable steps to maintain the confidentiality of the Thomas-Wade Park, Thomas-Orlando, Thomas-Tennessee, and Thomas-Ashley Park Trade Secrets. For example, Thomas, Wade Park Land, and Wade Park Land Holdings would not share the Trade Secrets with others without an agreement or obligation to maintain the trade secrets' confidentiality.

230. None of the Thomas-Wade Park, Thomas-Orlando, Thomas-Tennessee, or Thomas-Ashley Park Trade Secrets consisted of the same information that Thomas shared with Kalikow and the Gamma Defendants in the summer of 2018 in connection with the $148 million loan the Gamma Defendants had offered for the Orlando property. *See supra* at ¶ 152.

231. As one example, Thomas, Wade Park, and Wade Park Land Holdings shared with Goodman the details of existing and prospective financing arrangements in place for the Wade Park property; the identity of potential business partners and tenants for the Wade Park project; and internal financial analyses and projections relating to the Wade Park property. But they did not share this information with Kalikow or the Gamma Defendants.

232. Similarly, Thomas (and other Thomas-affiliated entities) shared with Goodman confidential information about the unique aspects of the Orlando

property that gave it a particularly high value, but they did not share this information with Kalikow and the Goodman Defendants.

233.    Likewise, Thomas (and other Thomas-affiliated entities) shared with Goodman confidential information about the executed leases in place at the Tennessee property, but they did not share this information with Kalikow and the Goodman Defendants.

234.    And Thomas (and other Thomas-affiliated entities) shared with Goodman confidential information about the Ashley Park project, including additional development plans, but they did not share this information with Kalikow and the Goodman Defendants.

235.    Kalikow and the Gamma Defendants knew of the joint venture between Thomas, Cathy, Goodman, Wade Park Land, and Wade Park Land Holdings; they knew of Goodman's role as manager of Fourth Quarter Properties; they knew that Goodman owed fiduciary duties to Thomas, Wade Park Land, and Wade Park Land Holdings; and they knew that Goodman had confidential information about Wade Park, the Orlando property, the Tennessee project, and Ashley Park.

236.    Similarly, Goodman knew of Kalikow's and the Gamma Defendants' involvement with the Wade Park project.  On information and belief, Goodman

also knew about Kalikow's and the Gamma Defendants' intent to force Thomas and Plaintiffs out of Wade Park and to take the Wade Park project for themselves. Goodman saw an opportunity to work with the Gamma Defendants to obtain the Wade Park project for himself.

237.     During the summer of 2018, Goodman spoke to Kalikow by phone many times.

238.     During some of those calls, on information and belief, Goodman shared the Thomas-Wade Park Trade Secrets with Kalikow and the Gamma Defendants.  Goodman also, on information and belief, shared the Thomas-Orlando, Thomas-Tennessee, and Thomas-Ashley Park Trade Secrets.

239.     In addition, in the fall of 2018, Goodman flew to New York to meet with Kalikow and the Gamma Defendants in person.  During that meeting, on information and belief, Goodman again shared the Thomas-Wade Park, Thomas-Orlando, Thomas-Tennessee, and Thomas-Ashley Park Trade Secrets with Kalikow and the Gamma Defendants.

240.     Kalikow and the Gamma Defendants also took action to ensure that Goodman would remain involved in the Wade Park project.  For example, Kalikow and the Gamma Defendants threatened to terminate the forbearance periods on the Gamma Bridge Loan unless Thomas and Plaintiffs kept Goodman involved in the

project. In addition, Kalikow and the Gamma Defendants required that Thomas and Plaintiffs report to them about Cathy's and Goodman's involvement and investment in Wade Park.

241.    Neither Thomas, Wade Park Land, nor Wade Park Land Holdings shared the Thomas-Wade Park, Thomas-Orlando, Thomas-Tennessee, or Thomas-Ashley Park Trade Secrets with Kalikow or the Gamma Defendants. Kalikow and the Gamma Defendants learned these Trade Secrets from Goodman.

242.    Kalikow and the Gamma Defendants used the Thomas-Wade Park, Thomas-Orlando, Thomas-Tennessee, and Thomas-Ashley Park Trade Secrets to gain an unfair advantage against and leverage over Thomas and Plaintiffs.

243.    For example, after Kalikow and the Gamma Defendants learned the Thomas-Orlando Trade Secrets, they abruptly withdrew the $148 million loan they had offered to Thomas for that property, and instead bought the existing loan on the property from Ardent Financial.

244.    Similarly, after Kalikow and the Gamma Defendants learned the Thomas-Tennessee Trade Secrets, they bought the existing loan on the Tennessee property from Ardent Financial.

245.    And after Kalikow and the Gamma Defendants learned the Thomas-Ashley Park Trade Secrets, they bought at least one existing loan on Ashley Park.

246.     On information and belief, Goodman eventually determined that if he got Thomas out of Ashley Park, he could take over the Ashley Park project to advance his own interests.  Beginning in at least the spring of 2018—while Goodman owed fiduciary duties to Thomas and Plaintiffs Wade Park Land, and Wade Park Land Holdings—Goodman, Kalikow, and the Gamma Defendants discussed Goodman's possible purchase of Ashley Park from the Gamma Defendants if they were successful in their scheme to take the properties from Thomas and Plaintiffs.  Goodman had these discussions behind Plaintiffs' and Thomas's back and without their knowledge or involvement.

247.     By purchasing loans on the Orlando, Tennessee, and Ashley Park projects, Kalikow and the Gamma Defendants prevented Thomas from pulling equity out of those properties to pay the Gamma Bridge Loan.

248.     Likewise, after Kalikow and the Gamma Defendants learned the Thomas-Wade Park Trade Secrets, they used the information to interfere with Plaintiffs' prospective investors and lenders for Wade Park.  *See, e.g.*, *supra* at ¶¶ 143-175.

249.     On information and belief, Goodman eventually concluded that with the Gamma Defendants' help, he had an opportunity to take all of these projects—

Wade Park, Orlando, Tennessee, and Ashley Park—over for himself. He thus began trying to get Thomas out of the projects entirely.

250. For example, beginning in at least the spring of 2018, Goodman had discussions with various lenders on the Tennessee property about purchasing the property, subject to the lenders' mortgages. Goodman had these discussions behind Plaintiffs' and Thomas's back and without their knowledge or consent.

251. Goodman pursued the same strategy with Wade Park. Beginning in at least the spring of 2018—again, while Goodman owed fiduciary duties to Thomas and Plaintiffs Wade Park Land, and Wade Park Land Holdings—Goodman, Kalikow, and the Gamma Defendants discussed Goodman's purchase of Wade Park from the Gamma Defendants if they were successful in their scheme to take the properties from Thomas and Plaintiffs. Goodman had these discussions behind Plaintiffs' and Thomas's back and without their knowledge or involvement.

## RICO ALLEGATIONS

### *The Enterprise*

252. Defendants Kalikow, Goodman, and each of the Gamma Defendants knowingly and intentionally formed an association in fact (the "Gamma Enterprise") with the purpose enriching themselves and defrauding Plaintiffs by taking Wade Park from Thomas and Plaintiffs.

253.     The Gamma Enterprise is engaged in, and its activities affect, interstate commerce.

254.     Goodman, Kalikow, and each of the Gamma Defendants is a person employed by or associated with the Gamma Enterprise.

255.     As described more fully herein, Defendants Kalikow, Goodman, and the Gamma Defendants each knowingly and intentionally conducted, participated in, or managed, directly or indirectly, the conduct of the Gamma Enterprise's affairs through the actual or attempted collection of unlawful debts or a pattern of racketeering activity.

256.      Defendants Kalikow, Goodman, and the Gamma Defendants each knowingly and intentionally conspired with each other and others to conduct, participate in, or manage, directly or indirectly, the conduct of the Gamma Enterprise's affairs through the actual or attempted collection of unlawful debts or a pattern of racketeering activity.

### *Collection of Unlawful Debts*

257.     The Gamma Bridge Loan was an unlawful debt within the meaning of 18 U.S.C. § 1961(6).

258. The Gamma Bridge Loan is unenforceable under state law because of the laws relating to usury, as described in Paragraphs 408 through 417 of this Complaint.

259. Defendants Kalikow and the Gamma Defendants were in the business of lending money.

260. The Gamma Bridge Loan was incurred at a usurious rate, and the rate is at least twice the enforceable rate. *See infra* at ¶¶ 413-414.

261. Kalikow and the Gamma Defendants collected on the unlawful debt by engaging in the actions described in this Complaint over a substantial period of time, and covering at least 25 months, which resulted in Kalikow and the Gamma Defendants receiving at least $625 million in cash and property on a loan with a principal amount of $82.75 million.

### *Predicate Acts – the Racketeering Activity*

#### Wire Fraud – 18 U.S.C. § 1343

262. Kalikow and the Gamma Defendants committed the predicate act of wire fraud in violation of 18 U.S.C. § 1343.

263. Defendants formed a scheme or artifice to defraud Plaintiffs of money and property.

264. The object of Defendants' scheme was to obtain money or property, including (but not limited to) depriving Plaintiffs Wade Park Land and Wade Park Land Holdings of their respective interests in the north and south Wade Park properties, as well as of at least $76.6 million in cash and property held by Plaintiffs. As alleged in this Complaint, each of the cash payments or property transfers made from Plaintiffs to the Gamma Defendants resulted from Defendants' fraudulent scheme.

265. Defendants used interstate wire communications in furtherance of their scheme over a substantial period of time. For example, on or around December 2, 2016, Kalikow and the Gamma Defendants, in a phone conversation with Thomas and others, falsely stated that they did not want to own the Wade Park project. *See supra* at ¶¶ 75-76.

266. Similarly, in January 2019, Defendant Kalikow participated in a series of interstate phone calls with Thomas, non-party Jake Sharp, and executives from non-party Columbia Pacific. During those phone calls, Kalikow made false statements about the Gamma Defendants' willingness to agree to a loan proposal made by Columbia Pacific. *See supra* at ¶¶ 166, 167, 172, 173.

267. Other instances of false statements made by Kalikow and the Gamma Defendants through the use of interstate wires and as part of their scheme to

defraud Plaintiffs are alleged in this Complaint. *See*, *e.g.*, *supra* at ¶¶ 158, 183, 186, 189, 194, 198.

268.    Kalikow and the Gamma Defendants engaged in the fraudulent scheme with the specific intent to deceive or defraud Plaintiffs. *See*, *e.g.*, *supra* at ¶¶ 76-77, 162, 173, 189, 194, 197, 199, 202, 204.

269.    As a direct and proximate result of Defendants' wire fraud, Plaintiffs have suffered injury through the loss of their property and money. *See*, *e.g.*, *supra* at ¶¶ 207-208.

<u>Theft of the Thomas-Wade Park Trade Secrets – 18 U.S.C. § 1832</u>

270.    Kalikow, the Gamma Defendants, and Goodman committed the predicate act of theft of the Thomas-Wade Park Trade Secrets in violation of 18 U.S.C. § 1832.

271.    Thomas, Plaintiff Wade Park Land, or Plaintiff Wade Park Land Holdings own the Thomas-Wade Park Trade Secrets, which include, among other things, details about Thomas's plans for developing the properties; Thomas's plans for leasing the properties and otherwise monetizing the properties' inherent value; details of the financing arrangements in place for the properties, as well as of prospective financing options; the identity of potential business partners and tenants; internal financial analyses and projections relating to the properties; and

confidential information developed by Thomas (and not known to anyone outside of Thomas's team) about the particular aspects of the Wade Park properties.

272.     Plaintiffs have taken reasonable measures to keep the Thomas-Wade Park Trade Secrets confidential, including (but not limited to) maintaining a policy of sharing the information outside of Thomas-affiliated entities only upon an express agreement by or a duty on the part of the recipient of the information that the Thomas-Wade Park Trade Secrets will be kept confidential.

273.     The Thomas-Wade Park Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

274.     The Thomas-Wade Park Trade Secrets are related to a product or service used in or intended for use in interstate commerce in that, among other things, they relate to the development of commercial real estate, including the acquisition of funds and products in connection with such development, all of which are used in interstate commerce.

275.     Plaintiffs disclosed the Thomas-Wade Park Trade Secrets to Blake Goodman.  *See supra* at ¶¶ 222, 223, 231.  Because of his fiduciary obligations to

Thomas, Wade Park Land, and Wade Park Land Holdings, Goodman was under a duty to maintain the confidentiality of the Thomas-Wade Park Trade Secrets.

276.     Without authorization, Goodman conveyed the Thomas-Wade Park Trade Secrets to Defendants Kalikow and the Gamma Defendants multiple times in interstate phone calls and in person, for the economic benefit of Defendants and with knowledge that conveying such information would injure Plaintiffs, as alleged *supra* at ¶¶ 237-239.

277.     Defendants Kalikow and the Gamma Defendants knowingly received the Thomas-Wade Park Trade Secrets multiple times, knew that Goodman was under a fiduciary duty to maintain the confidentiality of the Thomas-Wade Park Trade Secrets, and knowingly conspired with Goodman to use the Thomas-Wade Park Trade Secrets without authorization and knowing that the use of the Thomas-Wade Park Trade Secrets would injure Plaintiffs, as alleged *supra* at ¶¶ 235, 237, 238, 239, 241, 242, 248, 251.

278.     As a direct and proximate result of Defendants' actions, Plaintiffs have been injured through the loss of their property and money.

<u>Theft of the Thomas-Orlando Trade Secrets – 18 U.S.C. § 1832</u>

279.    Kalikow, the Gamma Defendants, and Goodman committed the predicate act of theft of the Thomas-Orlando Trade Secrets in violation of 18 U.S.C. § 1832.

280.    Thomas or other Thomas-affiliated entities own the Thomas-Orlando Trade Secrets, which include, among other things, details about Thomas's plans for developing the property; Thomas's plans for leasing the properties and otherwise monetizing the property's inherent value; details of the financing arrangements in place for the property, as well as of prospective financing options; the identity of potential business partners and tenants; internal financial analyses and projections relating to the properties; and confidential information developed by Thomas (and not known to anyone outside of Thomas's team) about the unique aspects of the Orlando property that gave it a particularly high value.

281.    Plaintiffs have taken reasonable measures to keep the Thomas-Orlando Trade Secrets confidential, including (but not limited to) maintaining a policy of sharing the information outside the Thomas-affiliated entities only upon an express agreement by or a duty on the part of the recipient that the Thomas-Orlando Trade Secrets will be kept confidential.

282.     The Thomas-Orlando Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

283.     The Thomas-Orlando Trade Secrets are related to a product or service used in or intended for use in interstate commerce in that, among other things, they relate to the development of commercial real estate, including the acquisition of funds and products in connection with such development, all of which are used in interstate commerce.

284.     Thomas and Plaintiffs, acting with authority to do so, disclosed the Thomas-Orlando Trade Secrets to Blake Goodman.  *See supra* at ¶¶ 222, 224, 232. Because of his fiduciary obligations, Goodman was under a duty to maintain the confidentiality of the Thomas-Orlando Trade Secrets.

285.     Without authorization, Goodman conveyed the Thomas-Orlando Trade Secrets to Defendants Kalikow and the Gamma Defendants multiple times in interstate phone calls and in person, for the economic benefit of Defendants and with knowledge that conveying such information would injure Plaintiffs, as alleged *supra* at ¶¶ 237-239.

286.     Defendants Kalikow and the Gamma Defendants knowingly received the Thomas-Orlando Trade Secrets multiple times, knew that Goodman was under a fiduciary duty to maintain the confidentiality of the Thomas-Orlando Trade Secrets, and knowingly conspired with Goodman to use the Thomas-Orlando Trade Secrets without authorization and knowing that the use of the Thomas-Orlando Trade Secrets would injure Plaintiffs, as alleged *supra* at ¶¶ 235, 237, 238, 239, 241, 242, 243, 247.

287.     As a direct and proximate result of Defendants' actions, Plaintiffs have been injured through the loss of their property and money.

## Theft of the Thomas-Tennessee Trade Secrets – 18 U.S.C. § 1832

288.     Kalikow, the Gamma Defendants, and Goodman committed the predicate act of theft of the Thomas-Tennessee Trade Secrets in violation of 18 U.S.C. § 1832.

289.     Thomas or other Thomas-affiliated entities own the Thomas-Tennessee Trade Secrets, which include, among other things, details about Thomas's plans for developing the property; Thomas's plans for leasing the properties and otherwise monetizing the property's inherent value; details of the financing arrangements in place for the property, as well as of prospective financing options; the identity of potential business partners and tenants; internal

financial analyses and projections relating to the properties; and confidential information developed by Thomas (and not known to anyone outside of Thomas's team) about the particular aspects of the Tennessee project.

290.     Plaintiffs have taken reasonable measures to keep the Thomas-Tennessee Trade Secrets confidential, including (but not limited to) maintaining a policy of sharing the information outside the Thomas-affiliated entities only upon an express agreement by or a duty on the part of the recipient that the Thomas-Tennessee Trade Secrets will be kept confidential.

291.     The Thomas-Tennessee Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

292.     The Thomas-Tennessee Trade Secrets are related to a product or service used in or intended for use in interstate commerce in that, among other things, they relate to the development of commercial real estate, including the acquisition of funds and products in connection with such development, all of which are used in interstate commerce.

293.     Thomas and Plaintiffs, acting with authority to do so, disclosed the Thomas-Tennessee Trade Secrets to Blake Goodman. *See supra* at ¶¶ 222, 225,

233. Because of his fiduciary obligations, Goodman was under a duty to maintain the confidentiality of the Thomas-Tennessee Trade Secrets.

294. Without authorization, Goodman conveyed the Thomas-Tennessee Trade Secrets to Defendants Kalikow and the Gamma Defendants multiple times in interstate phone calls and in person, for the economic benefit of Defendants and with knowledge that conveying such information would injure Plaintiffs, as alleged *supra* at ¶¶ 237-239.

295. Defendants Kalikow and the Gamma Defendants knowingly received the Thomas-Tennessee Trade Secrets multiple times, knew that Goodman was under a fiduciary duty to maintain the confidentiality of the Thomas-Tennessee Trade Secrets, and knowingly conspired with Goodman to use the Thomas-Tennessee Trade Secrets without authorization and knowing that the use of the Thomas-Tennessee Trade Secrets would injure Plaintiffs, as alleged *supra* at ¶¶ 235, 237, 238, 239, 241, 242, 244, 247.

296. As a direct and proximate result of Defendants' actions, Plaintiffs have been injured through the loss of their property and money.

<u>Theft of the Thomas-Ashley Park Trade Secrets – 18 U.S.C. § 1832</u>

297. Kalikow, the Gamma Defendants, and Goodman committed the predicate act of theft of the Thomas-Ashley Park Trade Secrets in violation of 18 U.S.C. § 1832.

298. Thomas or other Thomas-affiliated entities own the Thomas-Ashley Park Trade Secrets, which include, among other things, details about Thomas's plans for developing the property; Thomas's plans for leasing the properties and otherwise monetizing the property's inherent value; details of the financing arrangements in place for the property, as well as of prospective financing options; the identity of potential business partners and tenants; internal financial analyses and projections relating to the properties; and confidential information developed by Thomas (and not known to anyone outside of Thomas's team) about the particular aspects of the Ashley Park project.

299. Plaintiffs have taken reasonable measures to keep the Thomas-Ashley Park Trade Secrets confidential, including (but not limited to) maintaining a policy of sharing the information outside the Thomas-affiliated entities only upon an express agreement by or a duty on the part of the recipient that the Thomas-Ashley Park Trade Secrets will be kept confidential.

300.     The Thomas-Ashley Park Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

301.     The Thomas-Ashley Park Trade Secrets are related to a product or service used in or intended for use in interstate commerce in that, among other things, they relate to the development of commercial real estate, including the acquisition of funds and products in connection with such development, all of which are used in interstate commerce.

302.     Thomas and Plaintiffs, acting with authority to do so, disclosed the Thomas-Ashley Park Trade Secrets to Blake Goodman.  *See supra* at ¶¶ 222, 226, 234.  Because of his fiduciary obligations, Goodman was under a duty to maintain the confidentiality of the Thomas-Ashley Park Trade Secrets.

303.     Without authorization, Goodman conveyed the Thomas-Ashley Park Trade Secrets to Defendants Kalikow and the Gamma Defendants multiple times in interstate phone calls and in person, for the economic benefit of Defendants and with knowledge that conveying such information would injure Plaintiffs, as alleged *supra* at ¶¶ 237-239.

304.     Defendants Kalikow and the Gamma Defendants knowingly received the Thomas-Ashley Park Trade Secrets multiple times, knew that Goodman was under a fiduciary duty to maintain the confidentiality of the Thomas-Ashley Park Trade Secrets, and knowingly conspired with Goodman to use the Thomas-Ashley Park Trade Secrets without authorization and knowing that the use of the Thomas-Ashley Park Trade Secrets would injure Plaintiffs, as alleged *supra* at ¶¶ 235, 237, 238, 239, 241, 242, 245, 246, 247.

305.     As a direct and proximate result of Defendants' actions, Plaintiffs have been injured through the loss of their property and money.

<u>Money Laundering – 18 U.S.C. § 1956</u>

306.     Defendants Kalikow and the Gamma Defendants committed the predicate act of money laundering in violation of 18 U.S.C. § 1956.

307.     By reason of their wire fraud and theft of trade secrets, Defendants Kalikow and the Gamma Defendants obtained proceeds from illegal activity.

308.     Defendants knew that they obtained those funds through illegal activity.

309.     Defendants conducted multiple financial transactions with the proceeds from their illegal activity.

310.     For example, as part of their illegal activity, Kalikow and the Gamma Defendants obtained a number of forbearance agreements from certain Plaintiffs. On or around October 1, 2018, Plaintiffs paid a "fee" for one of the forbearance agreements by transferring title to 125 acres of real property in San Antonio, Texas, to the Gamma Defendants.

311.     Title to this real property was a proceed of the Defendants' illegal activity.

312.     On or around January 7, 2020, Kalikow and the Gamma Defendants transferred title to a portion of this real property to the City of San Antonio.

313.     On or around February 19, 2020, Kalikow and the Gamma Defendants transferred title to another portion of this real property to non-party AMFP IV Talevera LLC.

314.     These transfers qualify as financial transactions under 18 U.S.C. § 1956.

315.     Defendants conducted these financial transactions with the intent to promote the carrying on of their illegal activity.

<u>Georgia Uniform Securities Act – O.C.G.A. § 10-5-50</u>

316.     The Gamma Defendants, including Kalikow and GRE WP, committed fraud in connection with the purchase of a security in violation of O.C.G.A. § 10-5-50.

317.     The Gamma Defendants employed a device, scheme, or artifice to defraud; made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and engaged in an act, practice, or course of business that operates as a fraud or deceit upon another person.

318.     Specifically, Kalikow and the Gamma Defendants made at least the following misstatements or omissions in connection with GRE WP's purchase of a 75% membership interest in Wade Park Ventures:

318.1 In or around October of 2016, Kalikow and the Gamma Defendants failed to disavow or contradict non-party John Porter's statement that he and Porter and the Gamma Defendants were "partners" on a development project in Savannah, and Kalikow and the Gamma Defendants affirmed Porter's statement through nonverbal expressions, including body language and facial expressions. *See supra* at ¶ 52. Kalikow and the Gamma Defendants' omission of a disavowal or disagreement with Porter's statement was necessary to make the

statement made, in the light of the circumstances under which it was made, not misleading.

318.2 On or around December 2, 2016, Kalikow and the Gamma Defendants, in explaining the rationale for the "Hammer"—which was what the Gamma Defendants called GRE WP's purchase of a 75% membership interest in Wade Park Ventures—falsely stated to Thomas and others that they did not want to own the Wade Park project. *See supra* at ¶¶ 75-76.

318.3 On or around January 17, 2017, the Gamma Defendants made a false representation to Plaintiffs that they intended to comply with the obligation under the Wade Park loan agreement not to unreasonably withhold consent to a modification of the BAMCAP loan. *See supra* at ¶¶ 96, 98, 99.

318.4 In January 2019, Defendant Kalikow, in a series of phone calls with Thomas, non-party Jake Sharp, and executives from non-party Columbia Pacific, made false statements about the Gamma Defendants' willingness to agree to a loan proposal made by Columbia Pacific. *See supra* at ¶¶ 166, 167, 172, 173.

319. Defendants knew that these misstatements and omissions were false.

320. Plaintiffs were injured as a proximate and direct result of Defendants' misstatements and omissions.

<u>Theft by Deception – O.C.G.A. § 16-8-3</u>

321.     Defendants committed theft by deception in violation of O.C.G.A.

§ 16-8-3.

322.     The Gamma Defendants obtained Plaintiffs' property by deceitful

means or artful practices with the intention of depriving Plaintiffs of the property.

323.     Specifically, Defendants obtained at least the following property from

Plaintiffs:

- cash, personal property, and real estate valued in excess of $76.6 million; and

- real property at Wade Park valued in excess of $550 million.

324.     Defendants obtained the property by creating a false impression of an

existing fact that they knew to be false and then by failing to correct that false

impression. Specifically, they made at least the false representations described

*supra* at ¶¶ 52, 76, 98, 158, 162, 166, 167, 172, 173, 183, 186, 189, 194, 198.

325.     Plaintiffs were injured as a proximate and direct result of Defendants'

misstatements.

## CAUSES OF ACTION

## COUNT I: DECLARATORY JUDGMENT
## (*ULTRA VIRES* TRANSACTION)

### *(against the Gamma Defendants)*

326.     Plaintiffs reallege and incorporate Paragraphs 1 through 251 as if fully set forth herein.

327.     The Gamma Defendants drafted the Wade Park Ventures operating agreement.

328.     Section 2.4 of the Wade Park Ventures operating agreement states that "[t]he purpose" of Wade Park Ventures is to "directly or indirectly carry on the business of acquiring, owning, operating, managing, improving, repairing, renting, mortgaging, refinancing, selling, conveying and otherwise dealing with the Property and all activities reasonably related thereto."  The "Property" is defined as the north Wade Park property.  Section 2.4 also states that, "[e]xcept as permitted by this Section 2.4, the Company shall not engage in any other business."

329.     Under section 2.4(d) of the Wade Park Ventures operating agreement, Wade Park Ventures does not have the power or capacity to enter transactions with any "Affiliate" or "Related Party" of a member or manager of Wade Park

Ventures.

330.    In addition, section 2.9 of the Wade Park Ventures operating agreement provides that all terms of the operating agreement relating to management or governance of Wade Park Ventures also apply to Wade Park Land and Wade Park Land Holdings (which are Wade Park Ventures' subsidiaries). Accordingly, like Wade Park Ventures, Wade Park Land and Wade Park Land Holdings also lack the power or capacity to enter transactions with any "Affiliate" or "Related Party" of a member or manager of Wade Park Ventures.

331.    On or around July 30, 2018, Defendant Gamma Lending Omega acquired the BAMCAP Loan from BAMCAP.  At that moment, Gamma Lending Omega became a lender to Wade Park Land.

332.    In August, October, and December of 2018, Wade Park Land and Wade Park Land Holdings entered forbearance agreements with Gamma Lending Omega for the BAMCAP loan.

333.    In February 2019, Wade Park Land and Wade Park Land Holdings entered a deed-in-lieu-of-foreclosure agreement with Gamma Lending Omega.

334.    In or around February 2019, Wade Park Land and Wade Park Land Holdings delivered deeds to the Wade Park properties to Gamma Lending Omega.

335.     In each of these transactions—that is, in the three forbearance agreements, the deed-in-lieu agreement, and the delivery of deeds to Gamma Lending Omega—Wade Park Land and Wade Park Land Holdings purported to enter a transaction with an affiliate and related party of a member of Wade Park Ventures: Defendant GRE WP.

336.     Gamma Lending Omega is an affiliate and related party of GRE WP.

337.     Because Wade Park Land and Wade Park Land Holdings lack corporate authority and power to enter transactions with an affiliate or related party of GRE WP, the forbearance agreements, the deed-in-lieu agreement, and the delivery of deeds to the Wade Park Property are all *ultra vires*—and thus void.

338.     The Gamma Defendants drafted the Wade Park Ventures operating agreement.  They therefore knew that Wade Park Land and Wade Park Land Holdings lack corporate authority or power to enter transactions with affiliates or related parties of GRE WP.

339.     Nevertheless, the Gamma Defendants believe that the forbearance agreements, the deed-in-lieu agreement, and the delivery of deeds to the Wade Park Property are not *ultra vires* and thus are not void.

340.     As such, an actual and present dispute exists between Plaintiffs and the Gamma Defendants as to whether the forbearance agreements, the deed-in-lieu

agreement, and the delivery of deeds to the Wade Park Property are *ultra vires* and thus void, or instead were within the corporate authority of Wade Park Land and Wade Park Land Holdings.

341.    Because an actual and present dispute exists between Plaintiffs and the Gamma Defendants that affects the legal relations of the parties, Plaintiffs are entitled to a judicial determination of their rights and obligations pursuant to 28 U.S.C. § 2201, Rule 57 of the Federal Rules of Civil Procedure, and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

### COUNT II: FEDERAL RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c))

**(*against all Defendants*)**

342.    Plaintiffs incorporate and reallege the allegations in Paragraphs 1 through 325 as if fully set forth herein.

343.    Each of Plaintiffs is capable of holding a legal or beneficial interest in property.

344.    As described in, *inter alia*, Paragraphs 252 through 256 above, the Gamma Enterprise is engaged in, and its activities affect, interstate commerce.

345.    Defendants Kalikow, Goodman, and each of the Gamma Defendants agreed to and did conduct and participate in the conduct of the Gamma

Enterprise's affairs through the collection of an unlawful debt, as described in, *inter alia*, Paragraphs 257 through 261 above.

346.    Defendants Kalikow, Goodman, and each of the Gamma Defendants agreed to and did conduct and participate in the conduct of the Gamma Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of enriching themselves and intentionally defrauding Plaintiffs, as described in, *inter alia*, Paragraphs 262 through 325 above.

347.    Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of wire fraud, theft of trade secrets, and money laundering, as described in, *inter alia*, Paragraphs 262 through 325, over a substantial period of time and within a span of ten years.

348.    Defendants' acts of wire fraud, theft of trade secrets, and money laundering, as described in, *inter alia*, Paragraphs 262 through 325, were related to one another as part of Defendants' continuing and ongoing common scheme to enrich themselves and defraud Plaintiffs.

349.    The acts of wire fraud, theft of trade secrets, and money laundering set forth above constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

350.    Defendants have directly and indirectly conducted, participated in, and managed the conduct of the Gamma Enterprise's affairs through the collection

of unlawful debt and the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

351.    As a direct and proximate result of Defendants' collection of unlawful debt and pattern of racketeering activities, Plaintiffs have been injured in their business and property in an amount to be proven at trial.

## COUNT III: FEDERAL RICO (18 U.S.C. § 1962(d))

### *(against all Defendants)*

352.    Plaintiffs reallege the allegations in Paragraphs 1 through 351 as if fully set forth herein.

353.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C. §§ 1962(c).

354.    Defendants intentionally conspired and agreed to directly and indirectly use or invest income that is derived from the collection of unlawful debt and from a pattern of racketeering activity in an interstate enterprise and to conduct, participate in, and manage the conduct of the affairs of the enterprise through the collection of unlawful debt and a pattern of racketeering activity. Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) in violation of 18 U.S.C. § 1962(d).

355.     As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in an amount to be proven at trial.

## COUNT IV: GEORGIA RICO (O.C.G.A. § 16-14-4(b))

### *(against all Defendants)*

356.     Plaintiffs reallege and reassert the allegations of Paragraphs 1 through 355 as if fully set forth herein.

357.     As described in, *inter alia*, Paragraphs 252 through 256 above, the Gamma Enterprise is an enterprise under O.C.G.A. § 16-14-3.

358.     Defendants were employed by or associated with the enterprise.

359.     Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of wire fraud, theft of trade secrets, money laundering, violation of the Georgia Uniform Securities Act, and theft by deception, as described in, *inter alia*, Paragraphs 262 through 325 of this Complaint.

360.     The predicate acts set forth above constitute a pattern of racketeering activity under O.C.G.A. § 16-14-3.

361.     As a direct and proximate result of Defendants' collection of unlawful debt and racketeering activities, Plaintiffs have been injured in their business and property.

## COUNT V: GEORGIA RICO (O.C.G.A. § 16-14-4(a))

### *(against all Defendants)*

362.     Plaintiffs reallege the allegations in Paragraphs 1 through 361 as if fully set forth herein.

363.     As set forth above, Defendants directly and indirectly participated in, conducted, or managed the Gamma Enterprise through a pattern of racketeering activity under O.C.G.A. § 16-14-3.

364.     Through the pattern of racketeering activity or proceeds derived therefrom, Defendants acquired and maintained directly or indirectly, an interest in or control of real property or money.

365.     As a direct and proximate result of Defendants' collection of unlawful debt and racketeering activities, Plaintiffs have been injured in their business and property.

## COUNT VI: GEORGIA RICO (O.C.G.A. § 16-14-4(c))

### *(against all Defendants)*

366.     Plaintiffs reallege the allegations in Paragraphs 1 through 365 as if fully set forth herein.

367.     As set forth above, Defendants agreed and conspired to violate O.C.G.A. § 16-14-4.

368.     Defendants have intentionally conspired and agreed to directly and indirectly participate in, manage, or direct the Gamma Enterprise through a pattern of racketeering activity.

369.     Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate O.C.G.A. § 16-14-4(a) and (b) in violation of O.C.G.A. § 16-14-4(c).

370.     As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of O.C.G.A. § 16-14-4(c), Plaintiffs have been injured in their business and property.

## COUNT VII: FRAUD

### (*against Kalikow and the Gamma Defendants*)

371.     Plaintiffs reallege and incorporate the allegations in Paragraphs 1 through 325 as if fully set forth herein.

372.     At all relevant times, Gamma Real Estate Capital acted through Defendant Kalikow.

373.     In making the Gamma Bridge Loan, Defendant Gamma Real Estate Capital, and the other Gamma Defendants represented to Plaintiffs that they would not unreasonably withhold consent to a modification of the BAMCAP Loan.

374.     At the time Kalikow, Gamma Real Estate Capital, and the other Gamma Defendants represented to Plaintiffs that they would not unreasonably withhold consent to a modification of the BAMCAP Loan, the representations were false.

375.     At the time Kalikow, Gamma Real Estate Capital, and the other Gamma Defendants represented to Plaintiffs that they would not unreasonably withhold consent to a modification of the BAMCAP Loan, Kalikow, Gamma Real Estate Capital, and the other Gamma Defendants knew these representations were false.

376.     Kalikow's, Gamma Real Estate Capital's, and the other Gamma Defendants' representations that they would not unreasonably withhold consent to a modification of the BAMCAP Loan were incorporated into the loan agreement for the Gamma Bridge Loan.

377.     In the loan agreement for the Gamma Bridge Loan, Defendant Gamma Real Estate Capital represented that it would not unreasonably withhold consent to a modification of the BAMCAP Loan.

378.     Gamma Real Estate Capital's representation in the loan agreement for the Gamma Bridge Loan that it would not unreasonably withhold consent to a modification of the BAMCAP loan was false.

379.     At the time Gamma Real Estate Capital made the representation in the loan agreement, it knew the representation to be false.

380.     At the time Gamma Real Estate Capital made the representation in the loan agreement, it had no intention of complying with its promise not to unreasonably withhold consent to a modification of the BAMCAP Loan.

381.     The various forbearance agreements and the deed-in-lieu agreement repeated and re-stated Gamma Real Estate Capital's misrepresentation in the loan agreement for the Gamma Bridge Loan.

382.    Gamma Real Estate Capital made the representations with the intent to deceive Plaintiffs and with the intent to induce Plaintiffs to agree to, among other things, the Gamma Bridge Loan, the various forbearance agreements, and the deed-in-lieu agreement.

383.    Plaintiffs reasonably relied on Gamma Real Estate Capital's, Kalikow's, and the Gamma Defendants' misrepresentations in, among other things, deciding to agree to the Gamma Bridge Loan, the various forbearance agreements, and the deed-in-lieu agreement, and in deciding to deliver deeds to the Wade Park properties to the Gamma Defendants.

384.    Gamma Real Estate Capital, Kalikow, and the other Gamma Defendants failed to perform under the terms of the Gamma Bridge Loan by unreasonably withholding consent to a modification of the BAMCAP loan.

385.    Gamma Real Estate Capital's, Kalikow's, and the Gamma Defendants' misrepresentations proximately caused damages to Plaintiffs in an amount to be proven at trial.

## COUNT VIII:
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

### *(against Kalikow and the Gamma Defendants)*

386.    Plaintiffs reallege and incorporate Paragraphs 1 through 325 as if fully

set forth herein.

387.     At all relevant times, the Gamma Defendants acted through Defendant Kalikow.

388.     As alleged *supra*, Kalikow and the Gamma Defendants interfered with Thomas's prospective contracts for financing and business relationships with various non-party lenders, including Bluebell, Columbia Pacific, and others. *See, e.g.*, *supra* at ¶¶ 143-175.

389.     Kalikow and the Gamma Defendants acted improperly in interfering with Thomas's prospective contracts and business relationships, as described above. *See, e.g.*, *supra* at ¶¶ 143-175.

390.     Kalikow and the Gamma Defendants acted without privilege in interfering with Thomas's prospective contracts and business relationships.

391.     Kalikow and the Gamma Defendants were strangers to the various prospective contracts and business relationships with which they interfered.

392.     But for Kalikow's and the Gamma Defendants' improper interference, Plaintiffs would have obtained financing from one of these other potential financing partners.

393.     Kalikow and the Gamma Defendants intended to injure Plaintiffs.

394.     Kalikow's and the Gamma Defendants' tortious interference

proximately caused financial injury to Plaintiffs in an amount to be proven at trial.

## COUNT IX: BREACH OF CONTRACT

### *(against Defendants Gamma Real Estate Capital and Gamma Lending Omega)*

395.     Plaintiffs reallege and incorporate Paragraphs 1 through 251 as if fully set forth herein.

396.     In the loan agreement for the Gamma Bridge Loan, Gamma Real Estate Capital agreed not to unreasonably withhold consent to a modification of the BAMCAP loan.

397.     Gamma Real Estate Capital assigned its rights and delegated its duties under the loan agreement for the Gamma Bridge Loan to Defendant Gamma Lending Omega.

398.     Gamma Real Estate Capital and Gamma Lending Omega breached the loan agreement by, among other things, unreasonably withholding consent to modification of the BAMCAP loan.

399.     Plaintiffs Wade Park Land and Wade Park Land Holdings fulfilled all of their obligations and duties under the loan agreement for the Gamma Bridge Loan.

400.     Gamma Real Estate Capital's and Gamma Lending Omega's breach of the loan agreement injured Plaintiffs Wade Park Land and Wade Park Land Holdings in an amount to be proven at trial.

## COUNT X: UNJUST ENRICHMENT

### (alleged in the alternative against the Gamma Defendants)

401.     Plaintiffs reallege and incorporate Paragraphs 1 through 251 as if fully set forth herein.[7]

402.     As a result of Defendants' wrongful conduct, the Gamma Defendants have obtained a significant benefit to Plaintiffs' detriment, including their retention of substantial amount of money and of valuable real property approximating a total of $625 million. *See, e.g.*, *supra* at ¶¶ 207-208.

403.     Thomas, a Thomas-affiliated entity, Wade Park Land, or Wade Park Land Holdings paid the Gamma Defendants at least $76.6 million in cash and property.

404.     In addition, the Gamma Defendants claim ownership of the north and south Wade Park properties, which themselves are valued at over $550 million.

405.     The Gamma Defendants have not compensated Plaintiffs for these

---

[7]     To the extent that this Count incorporates allegations related to Count IX (breach of contract), Plaintiffs plead this Count in the alternative in the event that the Court concludes no contract existed.

benefits.

406.    The Gamma Defendants' failure to compensate Plaintiffs for these benefits is unjust.

407.    Plaintiffs have suffered and will continue to suffer damages as a direct and proximate result of Defendants' misconduct.

## COUNT XI: USURY

### (against Gamma Real Estate Capital and Gamma Lending Omega)

408.    Plaintiffs reallege the allegations in Paragraphs 1 through 251 as if fully set forth herein.

409.    Wade Park Land and Wade Park Land Holdings entered the Gamma Bridge Loan with Gamma Real Estate Capital on or around January 17, 2017.  The loan's principal amount was $82.75 million.  Gamma Real Estate Capital later assigned its interest in the Gamma Bridge Loan to Gamma Lending Omega.

410.    The Gamma Bridge Loan is subject to usury limitations on the maximum permissible rate of interest that may be charged and recovered from Plaintiffs.

411.    On its face, the Gamma Loan incurred interest at a rate of 13% per annum.  Default interest was charged at a rate of 21% per annum.

412.     Yet over the life of the Gamma Loan, Wade Park Land and Wade Park Land Holdings paid Gamma Real Estate Capital and Gamma Lending Omega interest far in excess of both the stated interest rate and the maximum interest rate authorized by law.

413.     To date, Wade Park Land and Wade Park Land Holdings have paid more than $26.6 million in interest payments to Gamma Real Estate Capital and Gamma Lending Omega on the Gamma Bridge Loan.  They have also paid more than $38.72 million in extension and forbearance fees on the Gamma Bridge Loan through a combination of cash payments and real-estate transfers.  Further, Wade Park Land and Wade Park Land Holdings were forced to transfer ownership in the Wade Park north and south properties to Gamma Real Estate Capital and Gamma Lending Omega as a principal payment for the Gamma Bridge Loan and BAMCAP loan, even though the value of the land is more than $550 million— $417.25 million more than the balance of the loans at the time of the transfer.  All of these payments and transfers qualify as interest payments subject to usury limitations.

414.     Wade Park Land and Wade Park Land Holdings have paid Gamma Real Estate Capital and Gamma Lending Omega more than $482.57 million in non-principal payments on the Gamma Loan over the course of 25 months, for an

effective interest rate of more than 280.37% per annum.[8]  The effective rate of interest that Wade Park Land and Wade Park Land Holdings paid for the Gamma Loan therefore exceeds the maximum rate authorized by applicable law.  *See, e.g.*, O.C.G.A. § 7-4-18; Tex. Fin. Code Ann. § 303.002; N.Y. Pen. Law § 190.40.

415.    Gamma Real Estate Capital and Gamma Lending Omega used the fees and charges described above as artifices for the charging of illegal interest. These fees and charges were unreasonable and confiscatory in nature and therefore cannot be enforced.

416.    Gamma Real Estate Capital and Gamma Lending Omega intentionally and knowingly collected more interest from Wade Park Land and Wade Park Land Holdings than is legally authorized, amounting to usury.

417.    Gamma Real Estate Capital's and Gamma Lending Omega's usury has damaged Wade Park Land and Wade Park Land Holdings and has resulted in a forfeiture of all interest payments made by Plaintiffs.  Plaintiffs are therefore entitled to a return of all the payments described above, in a final amount to be proven at trial.

---

[8]    Plaintiffs actually paid Defendants far more, as this total does not account for millions of dollars of other charges, such as late fees, origination fees, legal expenses, and title fees.  In total, Plaintiffs have paid more than $506 million in fees to Defendants.

**COUNT XII:**
**AVOIDANCE, PRESERVATION, AND RETURN OF CONSTRUCTIVELY**
**FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 548, 550, AND 551**

*(alleged in the alternative against Gamma Lending Omega*
*and WP Development Partners)*

418.    Plaintiffs reallege the allegations in Paragraphs 1 through 251 as if

fully set forth herein.[9]

419.    The following transactions constitute avoidable transfers under 11

U.S.C. §§ 548, 550, and 551: (i) Wade Park Land's purported transfer of the south

Wade Park property to Defendant WP Development Partners (as Gamma Lending

Omega's designated entity, for the benefit of Gamma Lending Omega) on or about

February 21, 2019 (the "South Property Transfer"); (ii) Wade Park Land Holdings'

purported transfer of the north Wade Park property to WP Development Partners

(as Gamma Lending Omega's designated entity, for the benefit of Gamma Lending

Omega) on or about February 21, 2019 (the "North Property Transfer"); and (iii)

Wade Park Land's and Wade Park Land Holdings' purported transfer of the related

property, including, without limitation, personal property, to Defendant WP

Development Partners (as Gamma Lending Omega's designated entity, for the

---

[9]    Plaintiffs plead this Count in the alternative to Count I (*ultra vires*
transaction) in the event that the Court concludes that no *ultra vires* transaction
occurred.  By pleading this Count, Plaintiffs do not concede that any of the
properties at issue legitimately were transferred.

benefit of Gamma Lending Omega) on or about February 21, 2019 (the "Personalty Transfer" and, collectively with the South Property Transfer, the North Property Transfer, and all other subsequently identified transfers from either of the Plaintiffs to such Defendants or their predecessors, successors, designees, and assigns, the "Transfers").

420.    If valid, each of the Transfers constitutes a fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(1).

421.    The Transfers, each of which is alleged to have occurred on or about February 21, 2019, occurred within two years before the Petition Date.

422.    The Transfers were made to or for the benefit of Defendants Gamma Lending Omega and WP Development Partners.

423.    Plaintiffs Wade Park Land and Wade Park Land Holdings received less than a reasonably equivalent value in exchange for the Transfers because (i) the value of the south Wade Park property greatly exceeded Wade Park Land's alleged indebtedness to Gamma Lending Omega; (ii) the value of the north Wade Park property greatly exceeded Wade Park Land Holdings' alleged indebtedness to Defendant Gamma Lending Omega; and (iii) the value of the Transfers, collectively, greatly exceeded Plaintiff Wade Park Land's and Plaintiff Wade Park Land Holdings' alleged indebtedness to Defendant Gamma Lending Omega.

424. If valid, each of the Transfers caused each of such Plaintiffs to become insolvent because they left such Plaintiffs with no assets from which to satisfy their respective remaining obligations and debts to their other creditors.

425. In connection with each of the Transfers, each of such Plaintiffs was engaged in a transaction, or was about to engage in a transaction, for which any property remaining for the particular Plaintiff was an unreasonably small capital. That is because each of the Transfers, if valid, left each of such Plaintiffs with virtually no remaining assets.

426. In connection with each of the Transfers, each of such Plaintiffs intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as the debts became due. That is because each of the Transfers, if valid, left each of such Plaintiffs with virtually no remaining assets.

427. Each of Defendants WP Development Partners and Gamma Lending Omega is either the initial transferee of the Transfers, the immediate or mediate transferee of such initial transferee, or is an entity for whose benefit the Transfers were made.

428. Based on the foregoing, pursuant to 11 U.S.C. §§ 548, 550, and 551, each of such Plaintiffs, as a Debtor, is entitled (i) to a judgment avoiding and

preserving the Transfers and directing that the Transfers be set aside or, only in the

alternative, (ii) to a judgment recovering the Transfers or the value thereof plus

interest, with each of such Plaintiffs reserving the right to name additional

defendants, plus all other available remedies, including, without limitation,

attachment, other provisional remedies against the transferred assets, and

injunctive relief against further disposition of such assets.

## COUNT XIII:
## AVOIDANCE, PRESERVATION, AND RETURN OF CONSTRUCTIVELY VOIDABLE TRANSFERS UNDER THE GEORGIA UNIFORM VOIDABLE TRANSACTIONS ACT, O.C.G.A. § 18-2-70, *ET SEQ.* AND 11 U.S.C. §§ 544, 550, AND 551

### *(alleged in the alternative against Gamma Lending Omega and WP Development Partners)*

429.    Plaintiffs reallege the allegations in Paragraphs 1 through 251 and 418

through 428 as if fully set forth herein.[10]

430.    Pursuant to 11 U.S.C. § 544, Plaintiffs Wade Park Land and Wade

Park Land Holdings, as the Debtors, may avoid any transfer of property of the

Debtors that may be avoided by an actual or hypothetical creditor under applicable

---

[10]    Plaintiffs plead this Count in the alternative to Count I (*ultra vires* transaction) in the event that the Court concludes that no *ultra vires* transaction occurred.  By pleading this Count, Plaintiffs do not concede that any of the properties at issue legitimately were transferred.

state law, which, in this case, is the Georgia Uniform Voidable Transactions Act, O.C.G.A. § 18-2-70, *et seq*.

431.     Each of the Transfers, if valid, constitutes a voidable transfer within the meaning of O.C.G.A. § 18-2-74(a)(2) because (i), as alleged *supra* at ¶ 423, each of Plaintiffs Wade Park Land and Wade Park Land Holdings did not receive a reasonably equivalent value in exchange for the Transfers and (ii), because each of the Transfers, if valid, left each of such Plaintiffs with virtually no remaining assets, (a) each of such Plaintiffs was engaged or was about to engage in a transaction for which the remaining assets of each of such Plaintiffs were unreasonably small in relation to the transaction and (b) each of such Plaintiffs intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as the debts became due.

432.     Each of the Transfers, if valid, also constitutes a voidable transfer within the meaning of O.C.G.A. § 18-2-75(a) because (i), as alleged *supra* at ¶ 423, each of Plaintiffs Wade Park Land and Wade Park Land Holdings did not receive a reasonably equivalent value in exchange for the Transfers and (ii) each of such Plaintiffs became insolvent as a result of the Transfers because the Transfers, if valid, left each of such Plaintiffs with virtually no assets from which to satisfy each of such Plaintiffs' respective obligations and debts to their other creditors.

433. Each of Defendant WP Development Partners and Defendant Gamma Lending Omega is either the initial transferee of the Transfers, the immediate or mediate transferee of such initial transferee, or is an entity for whose benefit the Transfers were made.

434. Based on the foregoing, pursuant to 11 U.S.C. §§ 544, 550, and 551 and O.C.G.A. § 18-2-70, *et seq*., each of such Plaintiffs, as a Debtor, is entitled (i) to a judgment avoiding and preserving the Transfers and directing that the Transfers be set aside or, only in the alternative, (ii) to a judgment recovering the Transfers or the value thereof plus interest, with each of such Plaintiffs reserving the right to name additional defendants, plus all other available remedies, including, without limitation, attachment, other provisional remedies against the transferred assets, and injunctive relief against further disposition of such assets.

## COUNT XIV – BREACH OF FIDUCIARY DUTY

### *(against Blake Goodman)*

435. Plaintiffs reallege and incorporate Paragraphs 1 through 325 as if fully set forth herein.

436. Goodman owed a fiduciary duty to Thomas, Wade Park Land, and Wade Park Land Holdings to maintain the confidentiality of the Thomas-Wade Park Trade Secrets.

437. Goodman owed a fiduciary duty of loyalty to Thomas, Wade Park Land, and Wade Park Land Holdings.

438. Goodman breached his fiduciary duty to maintain the confidentiality of the Thomas-Wade Park Trade Secrets by, among other things, sharing the Thomas-Wade Park Trade Secrets with Kalikow and the Gamma Defendants, as alleged *supra* at ¶¶ 237-239.

439. Goodman breached his fiduciary duty of loyalty by, among other things, working with Kalikow and the Gamma Defendants to take the Wade Park project from Wade Park Land and Wade Park Land Holdings without their knowledge or consent, as alleged *supra* at ¶¶ 236, 249, 251.

440. Plaintiffs Wade Park Land and Wade Park Land Holdings suffered damages as a result of Goodman's conduct.

441. Goodman's conduct proximately caused damages to Wade Park Land and Wade Park Land Holdings in an amount to be proven at trial.

## COUNT XV – CONSPIRACY TO BREACH FIDUCIARY DUTIES

### *(against all Defendants)*

442. Plaintiffs reallege and incorporate Paragraphs 1 through 325 and 435

through 441 as if fully set forth herein.

443.     At all relevant times, the Gamma Defendants acted through Defendant Kalikow.

444.     As alleged *supra* at ¶¶ 218, 227, 436 Goodman owed a fiduciary duty to maintain the confidentiality of the Thomas-Wade Park Trade Secrets.

445.     As alleged *supra* at ¶¶ 218, 227, 437 Goodman owed a fiduciary duty of loyalty to Thomas, Wade Park Land, and Wade Park Land Holdings.

446.     Goodman, Kalikow, and the Gamma Defendants worked together towards a common scheme for Goodman to breach his fiduciary duties to Thomas, Wade Park Land, and Wade Park Land Holdings.

447.     Goodman, Kalikow, and the Gamma Defendants had a common design, purpose, and scheme for Goodman to breach his fiduciary duties to Thomas, Wade Park Land, and Wade Park Land Holdings.

448.     Goodman took overt actions to further the common scheme.

449.     Kalikow and the Gamma Defendants took overt actions to further the common scheme.

450.     Goodman, Kalikow, and the Gamma Defendants each intended for

Goodman to breach his fiduciary duties.

451. Wade Park Land and Wade Park Land Holdings suffered damages as a result of Goodman's, Kalikow's, and the Gamma Defendants' conduct.

452. Goodman's, Kalikow's, and the Gamma Defendants' conduct proximately caused damages to Wade Park Land and Wade Park Land Holdings in an amount to be proven at trial.

## COUNT XVI – MISAPPROPRIATION OF THE THOMAS-WADE PARK TRADE SECRETS (O.C.G.A. § 10-1-760)

### *(against all Defendants)*

453. Plaintiffs reallege and incorporate Paragraphs 1 through 325 as if fully set forth herein.

454. Defendants violated O.C.G.A. § 10-1-760, *et seq.*, by misappropriating the Thomas-Wade Park Trade Secrets.

455. Plaintiffs Wade Park Land and Wade Park Land Holdings owned the Thomas-Wade Park Trade Secrets, as alleged *supra* at ¶¶ 223, 271.

456. Plaintiffs Wade Park Land and Wade Park Land Holdings took reasonable measures to keep the Thomas-Wade Park Trade Secrets confidential.

457. The Thomas-Wade Park Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable

through proper means by, another person who can obtain economic value from the disclosure or use of the information.

458.    Goodman disclosed the Thomas-Wade Park Trade Secrets to Kalikow and the Gamma Defendants without consent or authorization to do so.

459.    At the time Goodman disclosed the Thomas-Wade Park Trade Secrets, Goodman knew or had reason to know that his knowledge of the Thomas-Wade Park Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

460.    Kalikow and the Gamma Defendants obtained the Thomas-Wade Park Trade Secrets from Goodman and used them to the detriment of Plaintiffs Wade Park Land and Wade Park Land Holdings.

461.    At the time Kalikow and the Gamma Defendants used the Thomas-Wade Park Trade Secrets, they knew or had reason to know that the Thomas-Wade Park Trade Secrets were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

462.    Goodman's disclosure of the Thomas-Wade Park Trade Secrets proximately caused damages to Plaintiffs Wade Park Land and Wade Park Land Holdings in an amount to be proven at trial.

463.     Kalikow's and the Gamma Defendants' use of the Thomas-Wade Park Trade Secrets proximately caused damages to Plaintiffs Wade Park Land and Wade Park Land Holdings in an amount to be proven at trial.

464.     Defendants' misappropriation of the Thomas-Wade Park Trade Secrets was willful, wanton, reckless, and malicious, entitling Plaintiffs Wade Park Land and Wade Park Land Holdings to an award of exemplary damages in an amount authorized by O.C.G.A. § 10-1-763(b).

465.     Pursuant to O.C.G.A. § 10-1-764, Plaintiffs Wade Park Land and Wade Park Land Holdings are entitled to an award of the attorneys' fees and costs incurred in this action because Defendants have willfully and maliciously misappropriated the Thomas-Wade Park Trade Secrets.

## COUNT XVII: PUNITIVE DAMAGES

### *(against all Defendants)*

466.     Plaintiffs reallege the allegations in Paragraphs 1 through 325 as if fully set forth herein.

467.     Actions by the Gamma Defendants, Kalikow, and Goodman show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences,

entitling Plaintiffs to an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1.

468.    The Gamma Defendants, Kalikow, and Goodman acted with the specific intent to cause harm to Plaintiffs.

## COUNT XVIII: ATTORNEYS' FEES

### *(against all Defendants)*

469.    Plaintiffs reallege the allegations in Paragraphs 1 through 325 as if fully set forth herein.

470.    The Gamma Defendants, Kalikow, and Goodman have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

471.    Accordingly, pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover their litigation expenses, including but not limited to Plaintiffs' reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Wade Park Land Holdings, LLC, Wade Park Land, LLC, and the Thomas Family Trust pray for the following:

(1)    preliminary and permanent injunctive relief prohibiting Defendants from taking any action to sell, transfer, devise, assign or otherwise alienate the

north and south Wade Park properties other than as ordered by the Court in connection with this action;

(2)     imposition of a constructive trust on the north and south Wade Park properties in favor of Plaintiffs Wade Park Land and Wade Park Land Holdings;

(3)      pursuant to 28 U.S.C. § 2201, Rule 57 of the Federal Rules of Civil Procedure, and Rule 7001 of the Federal Rules of Bankruptcy Procedure, a declaration that the forbearance agreements, the deed-in-lieu agreement, and the delivery of deeds to the Wade Park Property are *ultra vires* and void and that title to the north and south Wade Park properties therefore remains with Wade Park Land and Wade Park Land Holdings, respectively;

(4)     pursuant to 11 U.S.C. §§ 548, 550, and 551, (i) a judgment against each of Defendants WP Development Partners and Gamma Lending Omega avoiding and preserving the Transfers and directing that the Transfers be set aside or, only in the alternative, (ii) a judgment against each of such Defendants recovering the Transfers or the value thereof plus interest;

(5)     pursuant to 11 U.S.C. §§ 544, 550, and 551 and the Georgia Uniform Voidable Transactions Act, O.C.G.A. § 18-2-70, *et seq*., (i) a judgment against each of Defendants WP Development Partners and Gamma Lending Omega avoiding and preserving the Transfers and directing that the Transfers be set aside

or, only in the alternative, (ii) a judgment against each of such Defendants recovering the Transfers or the value thereof plus interest;

(6)     that Plaintiffs be awarded general and special damages;

(7)     that Plaintiffs be awarded punitive and treble damages;

(8)     that Plaintiffs be awarded their costs;

(9)     that Plaintiffs be awarded a judgment against Defendants;

(10)    that Plaintiffs be afforded a trial by jury on all triable issues, which trial by jury the Plaintiffs do not consent to be conducted by the Bankruptcy Court;

(11)    that the Court award Plaintiffs with such other and further relief as the Court deems just and proper.

Respectfully submitted this 16th day of October, 2020.

*/s/ James W. Cobb*
James W. Cobb
Georgia Bar No. 420133
jcobb@caplancobb.com
Julia Blackburn Stone
Georgia Bar No. 200070
jstone@caplancobb.com
Jessica A. Caleb
Georgia Bar No. 141507
jcaleb@caplancobb.com

**CAPLAN COBB LLP**
75 Fourteenth Street NE
Suite 2750
Atlanta, GA 30309
Tel: (404) 596-5600
Fax: (404) 596-5604

Counsel for Plaintiffs

**STONE & BAXTER, LLP**
By:

*/s/ David L. Bury, Jr.*
Ward Stone, Jr.
Georgia Bar No. 684630
wstone@stoneandbaxter.com
David L. Bury, Jr.
Georgia Bar No. 133066
dbury@stoneandbaxter.com
577 Mulberry Street, Suite 800
Macon, Georgia 31201
(478) 750-9898; (478) 750-9899 (fax)
Counsel for Debtors and Plaintiffs
Wade Park Land, LLC and Wade Park
Land Holdings, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2020, I filed a copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

/s/ *James W. Cobb*
James W. Cobb
GA Bar No. 420133
CAPLAN COBB LLP
75 Fourteenth Street, N.E., Suite 2750
Atlanta, GA 30309
(404) 596-5600 – Office
(404) 596-5604 – Fax
jcobb@caplancobb.com

*Counsel for Plaintiffs*